# 18-2990(L)

## 18-3710(CON), 18-3712(CON), 18-3715(CON), 18-3850(CON), 19-1272(CON)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

PETER GALBRAITH KELLY, JR., MICHAEL LAIPPLE, KEVIN SCHULER,

*Defendants,*

JOSEPH PERCOCO, STEVEN AIELLO, JOSEPH GERARDI,
LOUIS CIMINELLI, ALAIN KALOYEROS, AKA DR. K,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT
## JOSEPH GERARDI

MILTON L. WILLIAMS
JACOB GARDENER
AVNI P. PATEL
WALDEN MACHT & HARAN LLP
One Battery Park Plaza, 34th Floor
New York, New York 10004
(212) 335-2030

*Attorneys for Defendant-Appellant
Joseph Gerardi*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................. iii

JURISDICTIONAL STATEMENT ......................................... 1

ISSUES PRESENTED .................................................... 1

PRELIMINARY STATEMENT ............................................ 2

INTRODUCTION ........................................................ 3

STATEMENT OF THE CASE .............................................. 7

    A. The Alleged Scheme to Defraud ................................. 7

        1. The RFPs ..................................................... 7

        2. The Alleged Rigging of the RFPs ............................. 10

        3. Todd Howe ..................................................... 14

        4. The Government's Theory of Wire Fraud ..................... 17

    B. The Alleged False Statement .................................... 24

SUMMARY OF ARGUMENT .............................................. 25

ARGUMENT ............................................................ 26

    I. GERARDI'S WIRE FRAUD AND WIRE FRAUD
       CONSPIRACY CONVICTIONS MUST BE REVERSED
       BECAUSE THE GOVERNMENT'S THEORY OF
       PROSECUTION IS INVALID ..................................... 26

    II. GERARDI'S WIRE FRAUD AND WIRE FRAUD
       CONSPIRACY CONVICTIONS MUST BE REVERSED
       DUE TO INSUFFICIENT EVIDENCE .......................... 37

III. GERARDI'S WIRE FRAUD AND WIRE FRAUD
CONSPIRACY CONVICTIONS MUST BE OVERTURNED
BECAUSE THE DISTRICT COURT DENIED HIM HIS
CONSTITUTIONAL RIGHT TO PRESENT A
MEANINGFUL DEFENSE .......................................... 43

IV. GERARDI'S WIRE FRAUD CONVICTION MUST BE
REVERSED FOR LACK OF VENUE ........................... 47

V. GERARDI'S FALSE STATEMENT CONVICTION MUST
BE VACATED DUE TO PREJUDICIAL SPILLOVER
FROM THE INVALID WIRE FRAUD AND WIRE FRAUD
CONSPIRACY COUNTS .......................................... 49

   1. The Wire Fraud and Conspiracy Counts Likely Affected
the Jury's View of the False Statement Count ............... 50

   2. A Trial on the False Statement Count Alone would have
Featured a Much Different Set of Evidence.................. 54

   3. The Government's Case on the False Statement Count
was Far from Overwhelming ................................. 58

VI. GERARDI'S FALSE STATEMENT CONVICTION MUST
BE REVERSED DUE TO PROSECUTORIAL
MISCONDUCT.................................................... 61

CONCLUSION........................................................... 62

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

Carpenter v. United States,
484 U.S. 19 (1987) ....................................................... 28

Cleveland v. United States,
531 U.S. 12 (2000) ....................................................... 27

Crane v. Kentucky,
476 U.S. 683 (1986).................................................... 46

Jackson v. Virginia,
443 U.S. 307 (1979) .................................................... 37

Langston v. Smith,
630 F.3d 310 (2d Cir. 2011) ........................................ 38

Old Chief v. United States,
519 U.S. 172 (1997)..................................................... 51

People v. Cepeda,
851 F.2d 1564 (9th Cir. 1988)...................................... 49

Skilling v. United States,
561 U.S. 358 (2010)................................................ 26, 27

United States v. Al-Moayad,
545 F.3d 139 (2d Cir. 2008)........................................ 44

United States v. Berkery,
889 F.2d 1281 (3d Cir. 1989)....................................... 49

United States v. Binday,
804 F.3d 558 (2d Cir. 2015)................................. *passim*

United States v. Bruno,
383 F.3d 65 (2d Cir. 2004) ......................................... 50

United States v. Cassese,
428 F.3d 92 (2d Cir. 2005) ......................................... 37

United States v. Davis,
   689 F.3d 179 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

United States v. Davis,
   No. 13-CR-923 (LAP), 2017 WL 3328240 (S.D.N.Y. Aug. 3,
   2017), appeal withdrawn, No. 17-3190, 2017 WL 6803303
   (2d Cir. Dec. 7, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

United States v. Feola,
   420 U.S. 671 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

United States v. Finazzo,
   850 F.3d 94 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

United States v. Hamilton,
   334 F.3d 170 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57

United States v. Henry,
   29 F.3d 112 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

United States v. Hill,
   197 F.3d 436 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

United States v. Jacobs,
   531 F.2d 87 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   61

United States v. Jacobs,
   547 F.2d 772 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   62

United States v. Lange,
   834 F.3d 58 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

United States v. Litvak,
   808 F.3d 160 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45

United States v. McCallum,
   584 F.3d 471 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47

United States v. Mittelstaedt,
   31 F.3d 1208 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 31, 36

United States v. Murphy,
   323 F.3d 102 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 51

United States v. Novak,
   443 F.3d 150 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

United States v. Parker,
554 F.3d 230 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Pauling,
No. 17-2539-CR, --- F.3d ---, 2019 WL 2220129
(2d Cir. May 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38, 39

United States v. Pierce,
224 F.3d 158 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

United States v. Poindexter,
727 F. Supp. 1470 (D.D.C. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

United States v. Regent Office Supply Co.,
421 F.2d 1174 (2d Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

United States v. Rooney,
37 F.3d 847 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

United States v. Sadler,
750 F.3d 585 (6th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Scully,
877 F.3d 464 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

United States v. Shellef,
507 F.3d 82 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 32, 35, 36

United States v. Slay,
717 F. Supp. 689 (E.D. Mo. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States v. Starr,
816 F.2d 94 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

United States v. Stewart,
907 F.3d 677 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

United States v. Svoboda,
347 F.3d 471 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

United States v. Takhalov,
827 F.3d 1307 (11th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 45

United States v. Veliz,
800 F.3d 63 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. Viloski,
    557 F. App'x 28 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

United States v. Wallach,
    935 F.2d 445 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Wright,
    665 F.3d 560 (3d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 56

**Statutes**

18 U.S.C. § 3143(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3143(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Rules**

Fed. R. App. P. 28(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## JURISDICTIONAL STATEMENT

Joseph Gerardi appeals from a judgment of conviction entered on December 11, 2018 in the United States District Court for the Southern District of New York (Caproni, J.). The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291. This appeal was timely filed.

## ISSUES PRESENTED

1.     Whether Gerardi's wire fraud and conspiracy convictions must be reversed because the Government's theory of prosecution is legally invalid.

2.     Whether Gerardi's wire fraud and conspiracy convictions must be reversed because the evidence was insufficient.

3.     Whether Gerardi's wire fraud and conspiracy convictions must be reversed because the district court denied him his constitutional right to present a meaningful defense.

4.     Whether Gerardi's wire fraud conviction must be reversed due to lack of venue.

5.     Whether Gerardi's false statement conviction must be vacated because of prejudicial spillover from the invalid wire fraud and conspiracy counts.

6.     Whether Gerardi's false statement conviction must be reversed because the charged statement was the product of prosecutorial misconduct.

## PRELIMINARY STATEMENT

On September 19, 2017, an indictment was filed in the Southern District of New York charging Joseph Gerardi with (i) wire fraud, in violation of 18 U.S.C. § 1343; (ii) wire fraud conspiracy, in violation of 18 U.S.C. § 1349; and (iii) making a false statement, in violation of 18 U.S.C. § 1001(a)(2).[1]  On July 12, 2018, following a three-week trial, the jury returned its verdict, convicting Gerardi of all three charges.[2]  On December 6, 2018, he was sentenced principally to 30 months' imprisonment, which represented an upward departure from the Guidelines range of 4-10 months.

Gerardi was granted bail pending appeal by the district court, which concluded that his appeal "raises a substantial question of law or fact likely to result in reversal [or] an order for a new trial" with respect to each count on which he was convicted.  18 U.S.C. § 3143(b)(1)(A)-(B); A2652-53.

---

[1]  The indictment also charged Gerardi with honest services fraud conspiracy, bribery, and making a separate false statement.  On March 13, 2018, Gerardi was acquitted of these counts, which were tried separately from those at issue in this appeal.

[2]  Gerardi's three codefendants at trial -- Steven Aiello, Dr. Alain Kaloyeros, and Louis Ciminelli -- were charged in the wire fraud conspiracy count; Aiello and Kaloyeros were also charged in the wire fraud count; and Ciminelli and Kaloyeros were charged in a separate wire fraud count.  All defendants were convicted on all counts.  Aiello was also convicted of honest services fraud conspiracy in the previous trial at which Gerardi was acquitted.

# INTRODUCTION

The Government charged Gerardi with participating in a wire fraud scheme by allegedly rigging a bidding process in order to secure construction contracts for his Syracuse-based company, COR Development ("COR"). Fatal to the Government's case, however, are the following facts: the Government's own witnesses consistently testified that the bidding process was not rigged; the same supposedly rigged process was used throughout the state in regions where COR did not compete; the Government could not identify a single competitor who was prevented or deterred from submitting a winning bid; none of the individuals who ran the bidding process was paid any bribes or kickbacks; a successful bid did not entitle the bidder to any contracts, only contract negotiation opportunities; and the purported "victim" (Fort Schuyler Management Corporation ("Fort Schuyler"), the entity requesting the bids) was in no way harmed or at risk of being harmed.

The bidding process in this case involved Requests for Proposal ("RFPs") issued by Fort Schuyler, a private non-profit entity affiliated with the State University of New York Polytechnic Institute ("SUNY Poly").[3] The RFPs, which Fort Schuyler issued in various regions throughout upstate New York, sought local

---

[3] In 2014, the SUNY College of Nanoscale Science and Engineering and the SUNY Institute of Technology merged to form SUNY Poly. A1000, A1040. For ease of reading, we refer to the institution (both pre- and post-merger) simply as "SUNY Poly."

"Preferred Developers" to construct "potential research, technology outreach, business development, manufacturing, and education and training hubs" in those regions. A1673, A1679, A1912, A1918. A company selected as a regional Preferred Developer was not guaranteed any construction work. It was merely allowed a non-exclusive opportunity to negotiate with Fort Schuyler for such work if and when it arose. Gerardi's company, COR, responded to the Syracuse-area RFP and was ultimately selected as a Syracuse-area Preferred Developer. Later, Fort Schuyler sought to construct two facilities in Syracuse. After hard-fought negotiations lasting approximately 10 months for the first project and 18 months for the second, Fort Schuyler awarded the contracts for those two projects to COR, which performed as promised.

The Government alleged that Gerardi helped secretly tailor the Syracuse-area RFP so that COR would become a Syracuse-area Preferred Developer. The Government argued that this constituted wire fraud and wire fraud conspiracy under this Court's "right to control" doctrine because it supposedly deprived Fort Schuyler of the right to control its assets. The Government further asserted that such deprivation exposed Fort Schuyler to a risk of economic harm (a requirement in a "right to control" case) because the alleged tailoring prevented potentially better or cheaper developers from becoming Preferred Developers. Gerardi's conviction on these counts cannot stand for multiple reasons.

First, the Government's theory of prosecution is invalid. This Court has repeatedly held that there is no fraud where, as here, the alleged deceit merely created a negotiation opportunity and did not deprive the purported victim of the services for which it freely negotiated. The deceit alleged here did no more than enable COR to become a Syracuse-area Preferred Developer, which provided an opportunity to negotiate for work. Once at the negotiation table, however, there was no alleged deceit regarding COR's qualifications, experience, fees, quality/scope of work, or any other essential element of the bargain. Because there was no alleged risk that Fort Schuyler would receive less than what it bargained for, under this Court's well-settled precedent, there can be no wire fraud or wire fraud conspiracy.

Second, even if one overlooks the invalidity of the Government's theory, there can still be no criminal liability because the Government failed to prove that Gerardi either harmed or risked harm to Fort Schuyler. Indeed, the Government's own witnesses consistently testified that the Syracuse RFP was generic and not tailored to anyone. The fact that RFPs with identical provisions were issued throughout the state in regions where COR did not compete confirms this. Moreover, the Government could not point to a single developer (much less one that was better or cheaper than COR) that was prevented from becoming a Preferred Developer as a result of the alleged tailoring. Finally, even assuming there was tailoring, the

Government's witnesses repeatedly testified that the supposedly tailored provisions were appropriate, fair, and beneficial to Fort Schuyler.

Third, Gerardi's wire fraud and conspiracy convictions must be reversed for an additional reason: the district court denied him his constitutional right to present a meaningful defense by precluding him from introducing evidence regarding the impeccable work COR performed for Fort Schuyler. Such evidence was critical and clearly relevant: it would have demonstrated that Gerardi operated in good faith, provided Fort Schuyler exactly what it bargained for, and that COR deserved Preferred Developer status.

Fourth, Gerardi's wire fraud conviction must be reversed for lack of venue. The Government failed to offer an interstate wire in furtherance of the alleged scheme to defraud that Gerardi either sent to, received from, or foresaw passing through the Southern District of New York.

Gerardi's false statement conviction likewise cannot stand. First, because the wire fraud and wire fraud conspiracy convictions must be reversed, the false statement conviction must be vacated due to the enormous prejudicial spillover from the reversed counts. The vast majority of the evidence presented at trial would have been inadmissible in a hypothetical trial on the false statement count alone, and such evidence heavily tainted the jury's view of this weak count. Second, the allegedly false statement was improperly procured through prosecutorial misconduct: the

Government lured Gerardi to an interview by falsely assuring him that he was not a target of investigation. Such egregious misconduct warrants dismissal.

## STATEMENT OF THE CASE

**A. The Alleged Scheme to Defraud**

1. The RFPs

In 2013 through 2015, SUNY Poly, headed by Dr. Alain Kaloyeros, sought to promote economic development opportunities in upstate New York. To effectuate that mission and allow Kaloyeros maximum speed and flexibility in pursuing partnerships with the private sector, two private non-profit entities -- Fort Schuyler and Fuller Road Management Corporation ("Fuller Road") -- were created. A1041, A1048, A1056, A1142. These entities served as vehicles for financing and construction management on SUNY Poly-related projects. Id. Between 2013 and 2015, Fort Schuyler and Fuller Road, in conjunction with SUNY Poly, issued a series of nearly identical "RFPs" throughout upstate New York seeking regionally based "Preferred Developers" that possessed certain desired qualifications.[4] A1168, A1670-84 (Syracuse), A1885-1908 (Marcy Nanocenter), A1909-27 (Buffalo), A2218-36 (Rochester), A2237-57 (Rensselaer), A2258-85 (Plattsburgh). This case

_____

[4] The term "RFP" is a misnomer, as there were no specific projects for which developers were submitting proposals. Because Fort Schuyler was seeking long-term partnerships with developers who possessed desired *qualifications*, the more accurate term would have been "RFQ." A1284.

concerns the RFPs issued by Fort Schuyler in "the Greater Syracuse Area" (A1670) and "the Greater Buffalo Area" (A1909) and the Preferred Developers selected for those regions.

Preferred Developer status gave companies an opportunity to negotiate for contracts with Fort Schuyler if and when local construction projects arose. The goal was to create long-term strategic partnerships with qualified local developers who knew the region, were invested in its success, and could advise Fort Schuyler on potential economic opportunities in the area.[5]  A1050, A1063, A1563, A1673, A1680, A1912, A1919.  Multiple Preferred Developers could be (and, in the case of Buffalo, were) selected for a given RFP, but Fort Schuyler was not required to award contracts to any of them.  A1044, A1065-66, A1069, A1231.  As the RFPs themselves made clear, Fort Schuyler was free at all times to abandon negotiations with any of its regional Preferred Developers and contract with whomever it pleased. A1066, A1096, A1679, A1918.

During the first week of October 2013, Fort Schuyler staff placed notifications of the Syracuse-area RFP in the print and online editions of the Syracuse Post Standard, consistent with Fort Schuyler's regular notification practice.  A1146-47, A1425, A2528-29.  Interested developers were given until October 15, 2013 to

_____

[5]  Notably, before Fort Schuyler issued its RFP in Syracuse (where Gerardi's company, COR, operated), it had never done any projects there.  A1090.

request a copy of the RFP (A1160, A1677) and until October 25, 2013 to submit a response containing their qualifications and experience (A1679). Four developers (including Gerardi's company, COR) requested a copy of the Syracuse RFP within the allotted timeframe[6] (A1158-59, A2521, A2528), and two (including COR) attended a scheduled conference with Fort Schuyler to discuss the RFP (A2528). Ultimately, COR was the only developer to respond to the RFP. A2528. Because COR possessed stellar qualifications and experience, it was selected by Fort Schuyler's Board of Directors in December 2013 as a Syracuse-area Preferred Developer. A1151, A1719-1805. No evidence was offered at trial (nor was it alleged) that the three other developers that had requested a copy of the RFP chose not to submit a response because they lacked the qualifications called for by the RFP or felt otherwise disadvantaged by the terms of the RFP. There was only one reason offered at trial (by Dean Fuleihan, Fort Schuyler's former Chair) for the dearth of responses to the Syracuse RFP, and that was because it did not specify any projects. A1069. However, the RFP could not have specified any projects because there were none slated for Syracuse at the time (A1044, A1050),[7] and because Fort Schuyler

---

[6]  A fifth Syracuse-area developer, Huber-Breuer Construction, requested the RFP on November 14, 2013, nearly a month after the deadline. Fort Schuyler staff -- with no input from Gerardi or his codefendants -- rejected the request due to its extreme untimeliness. A1154, A1159, A2523-29.

[7]  Two Syracuse-area projects arose after the RFP process concluded in 2013. Contract negotiations for those projects began in 2014 and 2015. A1422.

was explicitly seeking strategic long-term partnerships rather than contractors for specific engagements.[8]

The process governing the RFP for Buffalo mirrored that for Syracuse, except that it occurred on a slightly later schedule. A1916, A2528-29. LPCiminelli Inc. ("LPC") was one of three companies to respond to the Buffalo RFP, and was one of two selected as a Buffalo-area Preferred Developer. It was, by all measures, far and away the most qualified. A1083, A1096, A1225, A1566-67, A1570. Two projects ultimately arose in Buffalo: one was awarded to LPC; the other was awarded to the other Buffalo-area Preferred Developer. A1084, A1570.

### 2.    The Alleged Rigging of the RFPs

The Government alleged that Gerardi and his business partner Steven Aiello rigged the Syracuse RFP in COR's favor with the help of Kaloyeros (who was both the head of SUNY Poly and a Fort Schuyler Board member) and Todd Howe (a prominent government relations consultant hired by COR to help compete for government-funded contracts). The Government alleged that Louis Ciminelli (CEO of LPC) and Kevin Schuler (former Senior VP of LPC and a Government cooperator) rigged the Buffalo RFP in LPC's favor, also with the assistance of

---

[8]    Moreover, because there were no projects to bid on, and prices are generally project-specific (A1313, A1322, A1428), the RFP did not ask developers for price quotes. In any event, Fort Schuyler Board member Robert Geer testified that for construction development projects like those at issue in this case, Fort Schuyler often valued quality of service over price. A1134.

Kaloyeros and Howe (who had been separately retained by LPC as its government relations consultant). These allegations were based on the fact that Howe and Kaloyeros solicited COR and LPC's qualifications and input before the RFPs were issued, and that both companies satisfied the qualification requirements listed in the RFPs.

There were several glaring flaws to the Government's bid-rigging allegations. Most notably, they were contradicted by the Government's own witnesses, who uniformly testified that the RFPs were generic and <u>not</u> rigged for anyone. <u>See, e.g.</u>, A1093, A1096 (Fort Schuyler Chair Walter Barber confirming that the RFPs were not "made specific to any one developer" and "appeared not to be tailored to anyone"); A1171 (Fort Schuyler procurement expert Joseph Schell explaining that he "didn't see anything in the [RFPs] that indicated that these were tailored for anybody"); A1237, A1281 (Government cooperator Schuler testifying that "[f]or the most part" he found the RFPs "to be entirely generic," "it didn't look like there was anything unique," and he realized "there [wa]s going to be a competition"); A1067 (former Fort Schuyler Chair Dean Fuleihan testifying that the RFP process was competitive).

Not a single witness testified that the Syracuse RFP was, or appeared to be, rigged in COR's favor. With respect to the Buffalo RFP (which Gerardi had no alleged involvement with), two developers testified that the version that was initially

issued appeared to favor LPC because it sought local developers with 50 years' experience. A1296, A1322. However, that reasoning did not apply to the final, corrected version of the RFP, which changed the 50 years (called an "error" by Fort Schuyler's Chair (A1090)) to 15 (A1281, A1309), the number of years listed in every other RFP.

The generic nature of the RFPs was corroborated by the fact that the Syracuse and Buffalo RFPs were identical in all material respects to each other -- despite COR and LPC possessing vastly different qualifications (A1262, A1285-86) -- and to the RFPs issued in other regions throughout the state where neither company competed. A1168, A1670-84, A1885-1927, A2218-85.

The Government's bid-rigging allegations were also undermined by the undisputed fact that Kaloyeros received no bribe or kickback in exchange for doing the alleged rigging. The Government argued that "[i]t makes no difference why Kaloyeros did what he did" and that "motive is not an element of any of these crimes." A1462. Nevertheless, in a strained attempt to establish motive, the Government speculated that Kaloyeros helped Howe's clients (COR and LPC), not because of their indisputably excellent credentials and reputations, but in order to somehow improve his relationship with Governor Cuomo, who was supposedly close to Howe. A506. This hypothesis was factually unsupported and made little sense for numerous reasons, including that Kaloyeros did not need to improve his

relationship with Cuomo: Kaloyeros was considered a "rock star" by Cuomo (A1181) and had already become head of his own institution (A1007, A1060, A2380).

Lastly, given the numerous individuals at Fort Schuyler who were involved in the RFP drafting process -- including its Board Chair, procurement team, in-house lawyers, and outside counsel, none of whom were part of the alleged conspiracy to defraud Fort Schuyler (A1080, A1100, A1422-23, A1563, A1572-74, A1650, A2542-57) -- one might expect the Government to have offered testimony from these individuals regarding Kaloyeros's efforts to rig the process. Tellingly, however, there was none. Not a single witness recalled Kaloyeros requesting any specific qualification requirements or pressuring (or even persuading) others to insert any provisions with which they felt uncomfortable.[9] And there was no suggestion that Kaloyeros inserted any provisions covertly.[10]

---

[9]  If Kaloyeros had requested or demanded specific provisions, he would have been well within his rights given his unquestioned authority to dictate every RFP's purpose (A1080 (testimony of former Fort Schuyler Chair Dean Fuleihan)) and his duty to identify and serve SUNY Poly's needs.

[10]  Notably, the Government failed to explain why bid-rigging was necessary in the first place given that Fort Schuyler was not subject to any procurement rules and Kaloyeros dictated the procurement policy, meaning he and Fort Schuyler could simply select developers without any competitive bidding process at all. A1079-80, A1086, A1233, A1353.

3. <u>Todd Howe</u>

Although there were two separately charged bid-rigging schemes (one in Syracuse, the other in Buffalo), the Government alleged that they constituted one overarching conspiracy to defraud Fort Schuyler, largely because of the common involvement of Howe, who the Government conspicuously chose not to call as a witness despite his cooperation agreement and pivotal role in the case.[11] Howe was a successful and well-connected government relations consultant who worked at the esteemed Albany-based law firm Whiteman Osterman & Hanna and came highly recommended. A1178, A1229. His client list included both COR and LPC, as well as SUNY Poly.[12] In addition, his boss, the managing partner of Whiteman Osterman & Hanna, provided legal counsel to SUNY Poly and assisted in the drafting of the RFPs.[13] A1572-74, A1650, A1715-18.

Howe separately guided COR (in Syracuse) and LPC (in Buffalo) through their respective RFP processes, and the two companies (which operated 150 miles

---

[11]  In September 2016, Howe pleaded guilty to a laundry list of crimes and agreed to cooperate with the Government. His credibility, however, was badly damaged in a prior trial at which Gerardi was acquitted on all counts. In April 2019, Howe was sentenced to five years' probation.

[12]  Although Howe performed government relations work for SUNY Poly (A1007, A2647), there is no indication or allegation that COR or LPC knew this fact when they retained him. A1179, A2647-48.

[13]  There is no allegation that anyone at Whiteman Osterman & Hanna besides Howe did anything illegal.

apart and competed for separate RFPs) had virtually no interaction with each other, either directly or through Howe. In fact, when asked on direct examination who he conspired with, Schuler, the Government's star cooperator and former LPC executive, did not mention anyone at COR. A1172.

As its government relations consultant, Howe steered COR through the Syracuse RFP process, instructing its principals Gerardi and Aiello each step of the way.[14] Most notably, Howe requested COR's qualifications and shared them with Kaloyeros before the Syracuse RFP was issued; sent Gerardi and Aiello a preliminary draft of the Syracuse RFP shortly before issuance; and solicited Gerardi and Aiello's feedback on the draft to discuss with Kaloyeros. A1650-64, A1703.

In response to Howe's request for feedback on the draft RFP, Gerardi provided several hand-written comments, but did not request any changes that were anticompetitive or unique to COR. A1650-65. Just the opposite -- his comments sought to make the RFP less restrictive. Id. Gerardi's most substantive comment pertained to a draft provision requiring interested developers to submit audited financial statements. With respect to that draft requirement, which COR would have been able to satisfy (A1328), Gerardi noted that "[i]t would be more flexible" if developers could, if they so chose, submit "other financial information/statements

---

[14] See A2639 (finding by district court that "this scheme originated with and was nudged along by Howe").

-15-

that demonstrate the DEVELOPER'S financial qualifications." A1665. His reasoning was that audited financial statements were "generally only prepared by not-for-profit and/or public corporations," rather than by private developers, who would be bidding on the RFP. Id.[15] Thus, Gerardi's suggestion, which was incorporated into the final version of the RFP, benefited all bidders, not just COR. Far from rigging the RFP, it made it more inclusive and competitive.

Gerardi also commented on a provision that required developers to utilize sophisticated project management software, with a few illustrative examples mentioned. He asked, in a hand-written comment, whether including examples that COR already possessed was "too telegraphed." A1656. His comment was not directed at the sophisticated-software requirement itself. That requirement was unobjectionable: Fort Schuyler procurement expert Joseph Schell confirmed that Fort Schuyler regularly included such a requirement in its RFPs because it "helps to make sure the contractor will give you what you're asking for, … [a] sophisticated project done on time, done professionally" and "help[s] them communicate to us they're on schedule." A1155. Gerardi simply objected to the unnecessary mention, for illustrative purposes, of software COR already used, and he asked that the software references be removed. A1656. His request was ignored.

---

[15] See also A1660 (Gerardi's handwritten comment that audited financial statements were "typically prepared for non-for-profits or public corp[orations]").

### 4. The Government's Theory of Wire Fraud

The Government did not, and could not, argue that there was anything illegal about Gerardi viewing and providing input on the Syracuse RFP before it was issued. The RFP process was not subject to any procurement rules (A1079, A1086, A1353), and Government witnesses confirmed that it was common, and even encouraged, in the construction development industry for potential bidders to view, comment on, and influence RFPs before issuance. A1044, A1057, A1090, A1141, A1233-34, A1278. Rather, the Government alleged that Gerardi broke the law by rendering what was supposed to be a competitive RFP process[16] noncompetitive. Specifically, the Government's theory was that Gerardi engaged in a scheme to defraud Fort Schuyler by "excluding competition" in the Syracuse RFP process such that "other competitors were either kept out or chose not to apply," and that this created a risk of economic harm because "[t]hose competitors may have allowed Fort Schuyler to select someone with better value or a lower price." A875.

The Government's theory was eviscerated at trial. Although the Government demonstrated that, before the Syracuse RFP was issued, Gerardi was invited to, and did, provide Howe with COR's qualifications and thoughts on the RFP (A1650-65,

---

[16] See A1806 (12/19/13 Fort Schuyler resolution selecting COR as a Preferred Developer following a "competitive procurement process"), A1809 (3/25/14 Memorandum of Understanding between Fort Schuyler and COR noting COR's selection "after a competitive process").

A1700-02), which Howe passed along to Kaloyeros (A1560-62, A1647-49, A1666, A1703), and that the RFP contained qualification requirements that COR satisfied, the Government failed to show that this resulted in the exclusion of competition or any risk of harm to Fort Schuyler.

First, the Government could not identify a single developer (much less one offering better value or lower prices) that either lacked the qualification requirements listed in the RFP or chose not to compete because of those requirements.[17] This was not for lack of trying. Indeed, the Government had intended to call as a witness Andrew Breuer, the aggrieved owner of Syracuse-area construction developer Huber-Breuer Construction. A1012, A1100. In the middle of trial, however, it became clear that Huber-Breuer was excluded from the Syracuse RFP process not because of any of the RFP's supposedly tailored qualification requirements, but instead because Huber-Breuer requested the RFP a month too late,

---

[17] During the three-week trial, the Government called only two developers to testify (A1295-16, A1319-28), neither of whom spoke about or sought to compete for the Syracuse RFP. Like the vast majority of the evidence introduced at trial, the developers' testimony pertained solely to the Buffalo RFP. And neither developer testified that his company lacked the qualifications sought in that RFP, or that his company would have provided superior value or a lower price on any of the construction projects awarded by Fort Schuyler. Although one of the companies was denied Preferred Developer status in Buffalo, that was because its RFP response was severely deficient. A1088 (Fort Schuyler Chair Walter Barber agreeing that "they didn't appear to have spent any significant time or energy on their response"); A1566-67 (Fort Schuyler's evaluation that the response was just "an assembly of documents").

and Fort Schuyler staff (who drafted the RFP schedule without any input from the defendants) independently rejected the request due to its extreme untimeliness. A1154, A1159, A2523-29. Thereafter, the Government abandoned its plan to call Breuer.

Second, as discussed above, the Government's witnesses repeatedly testified that the RFP was generic and not tailored to COR, a fact confirmed by the issuance of RFPs with identical provisions throughout the state in regions where COR did not compete. Compare A1670-84 (Syracuse) with A1909-27 (Buffalo), A1885-1908 (Marcy Nanocenter), A2218-36 (Rochester), A2237-57 (Rensselaer), A2258-85 (Plattsburgh).

Third, the Government's witnesses consistently testified that each of the RFP provisions was appropriate, procompetitive, and good for Fort Schuyler (A1088, A1152, A1171), including those provisions that were supposedly included to favor COR, namely the requirements that a Preferred Developer have: (1) at least 15 years' experience[18]; (2) sophisticated computer software for project management[19];

---

[18] See A1063 (former Fort Schuyler Chair Dean Fuleihan testifying that the 15-year-experience requirement was "appropriate"), A1281 (Government cooperator Schuler stating that the requirement was "[a]t the high end of reasonableness" and agreeing that "anybody good" had 15 years of experience). Gerardi did not request the 15-year experience requirement. In fact, he questioned why it was included. A1656.

[19] See A1088 (Fort Schuyler Chair Walter Barber testifying that this requirement "ma[d]e sense" and that "[g]iven the magnitude of dollars of expenditure that were going to be applied and under short time frames to get things done, it seemed

(3) local headquarters[20]; and (4) an audited financial statement or financial reference letter.[21] Thus, even if the RFP could be said to have benefited COR, it unquestionably benefited Fort Schuyler. Notably, Fort Schuyler's procurement

---

appropriate to have most sophisticated methods available to manage the time to completion of project"); A1155 (Fort Schuyler procurement expert Joseph Schell confirming that Fort Schuyler "make[s] these kind of requests in other RFPs" because "[i]t's reasonable" and sophisticated computer software "helps to make sure the contractor will give you what you're asking for, … [a] sophisticated project done on time, done professionally," and "help[s] them communicate to us they're on schedule"). Gerardi did not request this standard-issue software requirement, and he asked that the listed software examples be removed. A1656. Regardless, it was not necessary for developers to possess any of the examples listed in order to satisfy the requirement. See A1675-76, A1088-89.

[20] See A1046 (Andrew Kennedy, Governor Cuomo's Deputy Director of State Operations, testifying that it was public policy to "engage a local developer"), A1050 and A1063 (Fuleihan explaining that the state was looking to encourage regional economic development and leverage local knowledge and expertise in identifying opportunities), A1081 (Barber stating that the purpose of the RFP was to create partnerships with regional developers); A1324 (Stephen Bills, whose company sought unsuccessfully to become a Buffalo-area Preferred Developer, testifying that the local-developer requirement was "reasonable"). Gerardi did not request the local-developer requirement, which existed in RFPs throughout the state. In any case, it was not much of a requirement, as non-local developers could, and did, compete by simply partnering with local developers. A1243, A1301, and A1321 (discussing how international developer Lendlease and Rochester-headquartered developer LeChase Construction Services partnered with Buffalo-headquartered developer Uniland Development).

[21] See A1065 (Fuleihan stating that the requirement was "appropriate"), A1089 (Barber testifying that the requirement "ma[de] sense" and that, depending on the circumstances, a financial reference letter -- which Gerardi had suggested -- could be even better than an audited financial statement). As discussed above, Gerardi's only request with respect to this requirement was to broaden it by allowing developers, who do not typically prepare audited financial statements, to submit financial reference letters if they preferred. A1660, A1665.

expert, Board Chair, and General Counsel each reviewed and approved the purportedly rigged RFP before it was issued.  A1050, A1080, A1152-55, A2542-57. They raised no concerns and are not alleged to have been involved in the alleged bid-rigging scheme.

Fourth, Fort Schuyler's Board selected COR as a Preferred Developer on the merits, without any input by Kaloyeros (who recused himself from the selection process), and when two Syracuse-area construction projects eventually arose, Fort Schuyler procurement staff engaged in hard-fought, arms-length negotiations with COR over the course of many months to secure "the best deal they could get." A1068, A1082, A1096-97, A1143-44, A1318, A1422, A1426.  Those negotiations were described as "frustrating," "tense," and "protracted," lasting 10 to 11 months for the first project, and 18 months for the second, far longer than COR's typical one-to-three-month contract negotiation process.  A1421-22.

Fifth, there was no evidence, or even allegation, that COR was unqualified, that it misrepresented its qualifications, or that it provided Fort Schuyler with anything less than what it bargained for.  As the Probation Department concluded (without objection from the Government), Gerardi's conduct was victimless. Gerardi PSR ¶ 70.[22]  Nor was there any evidence that Gerardi sought to harm Fort

---

[22]  As Gerardi pointed out in his sentencing submission, Fort Schuyler continued to work with COR under the terms of their existing contracts even after Gerardi and Aiello were indicted and convicted.  A2598.  Had Fort Schuyler been at risk of

Schuyler. In fact, Gerardi was eager to prove that he and COR performed exceptional work for Fort Schuyler at a fair and competitive price, but the district court precluded this evidence on relevance grounds. A1002.

Finally, the Government did not and could not dispute that regardless of the fairness of the RFP process, Fort Schuyler was not obligated to award COR any work and could at any time contract with any Preferred or non-Preferred Developer it pleased. Thus, even if the RFP created negotiation opportunities for COR, it did not limit any opportunities for Fort Schuyler.

In sum, the Government's theory was riddled with fatal flaws. These flaws even extended to what is usually the simplest issue of any trial: venue. Indeed, as the district court held, the prosecutors "had a fundamental misunderstanding of what they had to prove."[23] A559. After resting without producing an interstate wire that had passed through the Southern District of New York in furtherance of the alleged scheme to defraud (a fact revealed when the defendants moved for a judgment of acquittal based on, inter alia, lack of venue), the Government scrambled to reopen its case, which the district court allowed after stating that it had been "prepared to

_____

incurring losses by conducting business with COR, it surely would have, at some point, terminated its arrangement with COR and hired a different developer, or at least demanded a renegotiation of its contracts.

[23] The Government did not understand that the wires supporting the wire fraud counts also had to establish venue. A1388.

dismiss these counts." A1394. The Government's sole basis for asserting venue against Gerardi on the wire fraud count was an attempted phone call by Aiello to Howe on August 15, 2013 (when Aiello happened to be passing through New York City), which Gerardi had no reason to foresee and, because the call did not connect, was not in furtherance of the alleged scheme to defraud. A1393-94, A1406, A1414, A1938, 2188. Because the Government did not understand before trial what it had to prove (despite venue being the subject of extensive pretrial motion practice[24]), this wire, like all those through which the Government sought to establish venue, was not listed in its bill of particulars. A1404. The district court held -- incorrectly -- that this variance from the bill of particulars was not prejudicial. A1405.

To put it mildly, this case, as the district court observed, was "very difficult []
for the government." A1130. Yet despite its woefully inadequate theory of prosecution and misunderstanding of the law, the Government managed to introduce a mountain of inflammatory evidence and argumentation regarding the defendants' alleged greed, deception, preferential treatment, taxpayer-funded riches, and email deletion, the vast majority (and most inflammatory) of which pertained solely to the Buffalo RFP and had nothing to do with Gerardi.

---

[24] See, e.g., ECF No. 94 at 13-22, ECF No. 206.

## B. The Alleged False Statement

The Government charged Gerardi with falsely "denying involvement in tailoring the Syracuse RFP for the benefit of" COR during an interview with federal officers. A872-73.[25] According to FBI Agent Kathleen Garver, who attended the interview, Gerardi stated "that he did not ask for the RFP to be tailored to COR, nor did he feel as though it was tailored to COR." A1330.

Prior to trial, Gerardi moved to dismiss the false statement count due to prosecutorial misconduct. ECF No. 237 at 1-6. That misconduct consisted of an Assistant United States Attorney ("AUSA") falsely assuring Gerardi and Aiello's then-counsel that Gerardi and Aiello were not targets of the Government's investigation in an apparent effort to lure them to an interview. A267 ¶ 6. After interviewing both of them, the AUSA conceded that they had been targets the entire time. A268 ¶ 13. As the district court acknowledged, "the Government provided no sworn evidence to refute [defense counsel's] sworn allegation regarding who said what to whom before and after the proffers." SA47. Nonetheless, the district court denied Gerardi's motion to dismiss the false statement count and refused his request to hold a hearing to probe further into how and why the AUSA misrepresented Gerardi and Aiello's status. It held that "even if a misrepresentation had been made,

---

[25] Aiello was initially charged with doing the same. However, the Government dismissed Aiello's false statement charge just before trial.

and even if that misrepresentation had been made <u>deceitfully</u> …, such conduct would not rise to the level of prosecutorial misconduct warranting dismissal …." <u>Id</u>. (emphasis in original).

## SUMMARY OF ARGUMENT

Gerardi's wire fraud and conspiracy convictions should be reversed or vacated for the following reasons. <u>First</u>, the Government's theory of wire fraud is invalid because the alleged deceit did no more than enable arms-length contract negotiations and did not relate to any of the terms negotiated. <u>Second</u>, the Government failed to prove that the alleged deceit harmed, or risked harm to, Fort Schuyler. <u>Third</u>, the district court denied Gerardi his constitutional right to present a meaningful defense by precluding him from introducing evidence regarding the impeccable work COR performed for Fort Schuyler. And <u>fourth</u>, the Government failed to establish venue in the Southern District of New York.

Gerardi's false statement conviction should also be reversed or vacated. <u>First</u>, because the wire fraud and conspiracy convictions must be overturned, the false statement conviction must be vacated due to prejudicial spillover. And <u>second</u>, the allegedly false statement was improperly procured through prosecutorial misconduct.

# ARGUMENT

## I. GERARDI'S WIRE FRAUD AND WIRE FRAUD CONSPIRACY CONVICTIONS MUST BE REVERSED BECAUSE THE GOVERNMENT'S THEORY OF PROSECUTION IS INVALID

Gerardi's fraud convictions must be reversed because the Government failed to allege a valid theory of wire fraud. To reiterate, the Government's theory was that Gerardi defrauded Fort Schuyler by rigging the RFP process so that COR would become a Preferred Developer and have an opportunity to negotiate for potential future projects that could have been performed by a potentially better or cheaper competitor. A875. Because this alleged scheme, at most, enabled COR to pursue contract negotiations with Fort Schuyler, and did not involve deceit regarding any of the terms negotiated, there can be no wire fraud under this Court's well-settled precedent.

Whether the scope of a criminal statute encompasses alleged conduct is reviewed de novo. Skilling v. United States, 561 U.S. 358, 413 (2010); United States v. Veliz, 800 F.3d 63, 68 n.4 (2d Cir. 2015) ("Because [defendant] argues that the conduct proven was as a matter of law insufficient to constitute the charged offense, we review his claim de novo."); United States v. Hill, 197 F.3d 436, 444 (10th Cir. 1999) ("Whether the charged conduct can constitute a scheme to defraud … is a question of law we review de novo.").

To begin with, this is not a traditional fraud case involving the deprivation of money or tangible property. The Government prosecuted Gerardi and his codefendants under the Second Circuit's "right to control" doctrine of wire fraud, which "is predicated on a showing that some person or entity has been deprived of potentially valuable economic information." United States v. Wallach, 935 F.2d 445, 462-63 (2d Cir. 1991). "Right to control" is one of the more controversial doctrines in this Court's criminal law jurisprudence. The Supreme Court has never endorsed it, and other Circuits have questioned its viability. See, e.g., United States v. Sadler, 750 F.3d 585, 591 (6th Cir. 2014) (the "ethereal right to accurate information . . . fall[s] outside th[e] [wire fraud] statute"). The doctrine is unsound because it is unmoored from any common-law conception of property (the required object of wire fraud) and incompatible with Supreme Court caselaw on this topic. Indeed, an intangible "right to control" has not "long been recognized as property," Cleveland v. United States, 531 U.S. 12, 23 (2000), and it does not fit the paradigm of "the victim's loss of money or property suppl[ying] the defendant's gain," Skilling, 561 U.S. at 400.[26]

---

[26] Although we recognize that no single panel of this Court can overturn the Second Circuit's "right to control" doctrine, it can cabin that doctrine appropriately so that criminal liability does not attach to those who, like Gerardi, have not deprived anyone of anything resembling property. Also, as he did below (see A273-74, A1392), Gerardi seeks to preserve his right to challenge the very notion of "right to control" as a legitimate theory of property deprivation in the event that his conviction is upheld.

Given the staggering potential breadth of the "right to control" doctrine, which could theoretically criminalize the failure to mention any potentially valuable economic information, the Second Circuit has sharply limited its application to circumstances where the defendant's conduct "can or does result in some tangible harm." United States v. Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir. 1994)[27]; see also United States v. Finazzo, 850 F.3d 94, 112 (2d Cir. 2017) ("the deprivation of the right to control assets must be capable of creating tangible economic harm").

This Circuit has long made clear that there can be no such risk of harm -- and, therefore, no fraud -- where, as here, the alleged deceit merely leads the purported victim to the negotiating table and does not prevent it from receiving the services for which it freely negotiated. United States v. Starr, 816 F.2d 94, 99 (2d Cir. 1987) (holding that there was deceit but no mail or wire fraud because defendants "in no way misrepresented to their customers the nature or quality of the service they were providing" and "customers received exactly what they paid for"); United States v. Regent Office Supply Co., 421 F.2d 1174, 1179 (2d Cir. 1970) (holding that "solicitation of a purchase by means of false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the

---

[27] Although Mittelstaedt involved mail fraud, "[t]he mail and wire fraud statutes share the same language in relevant part" and are accordingly subject to "the same [statutory] analysis." Carpenter v. United States, 484 U.S. 19, 25 n.6 (1987).

bargain," does not "constitute a 'scheme to defraud' or 'obtaining money by false pretenses' within the prohibition of 18 U.S.C. § 1341").

Even as this Court has developed its "right to control" doctrine, it has taken pains to distinguish the deprivations recognized by that doctrine from the sort of deceit that <u>Starr</u>, <u>Regent</u>, and other cases have held outside the scope of the fraud statutes. <u>See Finazzo</u>, 850 F.3d at 115 (noting that there is no fraud, even when there is deception, if "customers freely bargained for a service and received that service"); <u>United States v. Shellef</u>, 507 F.3d 82, 109 (2d Cir. 2007) (holding that "fraudulent inducements to gain access to" a deal do not constitute wire fraud); <u>United States v. Novak</u>, 443 F.3d 150, 159 (2d Cir. 2006) (reversing mail fraud conviction because purported victims "received all they bargained for"); <u>Mittelstaedt</u>, 31 F.3d at 1217 ("[L]ack of information that might have an impact on the decision regarding where government money is spent, without more, is not a tangible harm and therefore does not constitute a deprivation of section 1341 'property.'"). As the Court made clear in <u>United States v. Binday</u>: "The right to control one's assets does not render every transaction induced by deceit actionable under the mail and wire fraud statutes…. Thus, we have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain." 804 F.3d 558, 570 (2d Cir. 2015). As Judge Thapar has noted while sitting on the Eleventh Circuit: "[T]he Second Circuit's interpretation of the wire-fraud statute is

not a parochial interpretation of an ambiguous provision of federal law. Their interpretation follows as a matter of logic from Congress's decision to use the phrase 'scheme to defraud' rather than 'scheme' or 'scheme to deceive.'" United States v. Takhalov, 827 F.3d 1307, 1314 (11th Cir. 2016). "[A]dopt[ing the Second Circuit's] interpretation as [its] own," the Eleventh Circuit held in Takhalov that "even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims 'received exactly what they paid for.'" Id. (quoting Shellef, 507 F.3d at 108).

There is no allegation that Fort Schuyler received from COR, or from LPC, anything less than what it paid for. Nor is there any allegation that Fort Schuyler was ever at risk of receiving less. Indeed, neither COR nor LPC is alleged to have misrepresented its qualifications, experience, fees, quality/scope of work, or anything else regarding the nature of its bargain with Fort Schuyler. See id. at 1313-14 (explaining that, under Second Circuit caselaw, if a defendant lies about anything other than "the price … or … the characteristics of the good[,] … then he has not lied about the nature of the bargain, has not 'schemed to defraud,' and cannot be convicted of wire fraud"). Thus, even assuming arguendo that Fort Schuyler was deceived into coming to the negotiation table with COR or LPC through a tailored

RFP process, there was no alleged deceit regarding the services for which it negotiated, and therefore no fraud.[28]

Moreover, it is undisputed that, once at the negotiating table, Fort Schuyler (a sophisticated entity with experienced procurement staff) was free to secure whatever terms it desired and to contract with whomever else it pleased if those terms were not met. The alleged scheme to defraud did not deprive, or seek to deprive, Fort Schuyler of this ability. See Mittelstaedt, 31 F.3d at 1217 ("To convict, the government had to establish that the omission caused (or was intended to cause) actual harm to the village of a pecuniary nature or that the village could have negotiated a better deal for itself if it had not been deceived." (emphasis omitted)). All the Government alleged was a scheme to tailor the RFP to obtain Preferred Developer status, which, as the Government conceded (A996), is not property.[29]

---

[28]  The defendants advanced this argument before and during trial. See, e.g., ECF No. 177 at 11-15; ECF No. 220 at 16-26; A272-75, A1382, A1391. The district court, however, rejected it. See SA11-16, A2637.

[29]  See United States v. Henry, 29 F.3d 112, 115, 116 (3d Cir. 1994) (holding that the "indictment … does not allege a scheme to defraud its victims of a property right" because a fair bidding process, though valuable, "is not a traditionally recognized, enforceable property right"); United States v. Slay, 717 F. Supp. 689, 693, 695 (E.D. Mo. 1989) (holding that "mere contemplation of an ongoing contractual relationship" does not rise to a property right protected by the mail and wire fraud statutes; "Had defendants' scheme succeeded … the terms of the actual franchise would [still] have to be worked out by the City and Archway Cablevision and a separate ordinance awarding the franchise would have to be passed by the City. Therefore, … the indictment fails to state an offense … because defendants' scheme

Preferred Developer status was merely a non-exclusive opportunity to negotiate for property.

The deceit alleged in this case is similar to that deemed insufficient by this Court to satisfy the mail and wire fraud statutes. Here the Government claimed that Gerardi and his codefendants deceived Fort Schuyler's Board of Directors by secretly defeating its expectation that Preferred Developers "would be picked through a fair and open competition."[30] A1013. Analytically, this is no different from the transaction-inducing deceit that Starr, Regent, Novak, Shellef, and other cases found nonactionable because the defendants did not misrepresent "the nature or quality of the service they were providing." Starr, 816 F.2d at 99.

In Starr, the defendants collected bulk mailings from customers and then sent those mailings through the post office. While hiding high-rate mail in low-rate mail packages and paying the low-rate price for the entire shipments, defendants charged

---

… did not and would not defraud the City of any property protected by the mail and wire fraud statutes.").

[30] Neither Gerardi nor his codefendants are alleged to have explicitly stated that COR was selected through a "fair and open competition." The Government merely argued that this was an implied feature of an RFP. A1014. The only alleged misrepresentations were: (1) that COR was selected as a Preferred Developer "after a competitive process" (A1809), which it indisputably was (the Government's argument was really that the process was not as competitive as it could have been); and (2) that COR did not use a lobbyist to influence the RFP process (A1803), which is correct because Howe was not a lobbyist (see A1928, A1931, 1933), as he and the managing partner of Whiteman Osterman & Hanna (who helped draft the RFPs) confirmed (A1285, A1704).

their customers as if the mailings were high-rate and produced false invoices to that effect to convince customers. This Court reversed the defendants' mail and wire fraud convictions because "[t]he misappropriation of funds simply ha[d] no relevance to the object of the contract; namely, the delivery of mail to the appropriate destination in a timely fashion." Id. at 100. Although the defendants created a false "expectation that [customers' money] would be used for a specific purpose, [which] implicitly constituted a part of the bargain between the parties," there was no fraud because "that defeated expectation alone would not affect the nature or quality of the services that was the basis of the customers' bargain." Id. at 99-100. The fact that customers might well have demanded lower prices or refused to do business with the defendants had they known of their scheme did not transform the deceit into fraud.

Similarly, in Regent, the defendants had stationary sales personnel misrepresent their identities to prospective customers so that the prospective customers would be willing to entertain the sales offers. The sales personnel, for example, fraudulently claimed that they had been referred by a friend of the customer or an officer of the customer's firm. Regent, 421 F.2d at 1176. While finding these lies "repugnant to standards of business morality," this Court reversed the defendants' mail fraud convictions because the misrepresentations were "not directed to the quality, adequacy or price of goods to be sold, or otherwise to the

nature of the bargain." Id. at 1179 (quotations omitted). It was irrelevant that customers may have agreed to buy the stationery at the offered price only because they were misled to believe that the stationery had been endorsed by people they trusted. Id. at 1181. All that mattered was that the defendants "did not attempt to deceive their prospective customers with respect to the bargain they were offering." Id. at 1182.

Novak involved payments made by contractors to union members for hours not actually worked. Following negotiations, the contractors agreed to pay the union employees for these "no-show" hours for a variety of reasons, including as settlement for the contractors' violation of a collective bargaining agreement. A portion of the payments was secretly kicked back to Novak (the vice-president and business manager of the union) by union leaders who oversaw the payment process and were appointed by Novak for their willingness to participate in the kickback scheme. The contractors were not aware of the kickbacks, and the Government maintained that "the contractors would never have issued checks for the no-show hours had they known that a portion of the money would be received by Novak." Novak, 443 F.3d at 157. Despite the fact that the contractors may well have negotiated differently had they known where their payments were going, this Court reversed Novak's mail fraud conviction because "the contractors received all they

bargained for, and Novak's conduct did not affect an essential element of those bargains." Id. at 159.

In Shellef, a company owned by one of the defendants bought an industrial chemical and falsely promised to export it out of the country, thereby acquiring it at a lower price without an excise tax adjustment. This Court reversed the defendants' wire fraud convictions because that misrepresentation, which may have "induced [the seller] to enter into a transaction it would otherwise have avoided," did not cause any "discrepancy between benefits reasonably anticipated [by the seller] and actual benefits received." Shellef, 507 F.3d at 109 (quotations omitted). Although the seller might have avoided the sale or demanded a higher price had it known the buyer's true purpose, there was no cognizable risk of economic harm (and therefore no fraud) because the seller received exactly what it was owed under its contract with the buyer.[31]

Like Starr, Regent, Novak, and Shellef, the scheme charged here did no more than induce contract negotiations under false pretenses. Also like those cases, even if the alleged deceit caused the allegedly defrauded party (here, Fort Schuyler) to

---

[31] See also United States v. Davis, No. 13-CR-923 (LAP), 2017 WL 3328240, at *16 (S.D.N.Y. Aug. 3, 2017) (setting aside wire fraud and conspiracy convictions against defendants who misrepresented their compliance with the Port Authority's MWBE requirements because the Port Authority "receive[d] the full benefit of its bargain"), appeal withdrawn, No. 17-3190, 2017 WL 6803303 (2d Cir. Dec. 7, 2017).

conduct negotiations with the defendants in a more favorable manner and ultimately award them contracts, there can be no fraud because there was no alleged deceit regarding the negotiated contract terms. Nor should the Government's vague allusions to the "risk of economic harm" be permitted to break down the distinction this Court has strenuously sought to maintain between appropriately charged "right to control" deprivations and inappropriately charged fraudulent inducements "to gain access to" contract negotiations. Shellef, 507 F.3d at 109.

In conclusion, the Government has taken the already dubious criminal doctrine of "right to control" and stretched it far beyond its limit. The Government asks this Court to uphold, for the first time ever, wire fraud and wire fraud conspiracy convictions based on an alleged deceit that merely created a negotiation opportunity and did not prevent the purported victim from receiving the services for which it freely negotiated. This Court has explicitly, and repeatedly, held that such a theory lies outside the scope of the wire fraud statute.[32] It should once again do so here.

---

[32] Because one cannot conspire to do something that is not illegal, United States v. Parker, 554 F.3d 230, 234 (2d Cir. 2009), the invalidity of the Government's wire fraud theory infects both the wire fraud and conspiracy counts. See Mittelstaedt, 31 F.3d at 1220 (holding that "[b]ecause none of the schemes in which Mittelstaedt participated involved an attempt to deprive another of 'money or property,' there can have been no conspiracy").

## II. GERARDI'S WIRE FRAUD AND WIRE FRAUD CONSPIRACY CONVICTIONS MUST BE REVERSED DUE TO INSUFFICIENT EVIDENCE

Even if one accepts the Government's invalid theory of prosecution, Gerardi's fraud convictions must still be reversed due to a lack of evidentiary support for that theory. The Government failed to prove its allegation that Gerardi exposed Fort Schuyler to a risk of economic harm by rigging the Syracuse RFP to exclude developers offering better value than COR.

On a sufficiency of evidence challenge, this Court "must be satisfied that after drawing all permissible inferences in favor of the government, a rational trier of fact could find that every element of the crime was established beyond a reasonable doubt." United States v. Pierce, 224 F.3d 158, 164 (2d Cir. 2000). "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." United States v. Cassese, 428 F.3d 92, 99 (2d Cir. 2005) (quotations omitted). A "mere modicum" of evidence cannot support a finding of guilt beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 320 (1979). Nor can "reasonable speculation," or proof that alleged facts are merely "likely" or "probable." United States v. Pauling, No. 17-2539-CR, --- F.3d ---, 2019 WL 2220129, at *8 (2d Cir. May 23, 2019).

No rational jury could conclude beyond a reasonable doubt that Fort Schuyler suffered, or was at risk of suffering, tangible economic harm. Not only did the evidence fail to prove such risk of harm, it conclusively established its absence.

First, although the Government's entire theory of harm was that the RFP excluded developers that were better or cheaper than COR, there was no evidence that any such developer was actually excluded. In fact, the Government could not identify a single developer (much less a better or cheaper one) that lacked the qualification requirements listed in the supposedly rigged RFP. The jury was simply expected to assume that such developers existed. "[A] conviction based on [such] speculation and surmise alone cannot stand …." Langston v. Smith, 630 F.3d 310, 314 (2d Cir. 2011) (quotation marks omitted); see also Starr, 816 F.2d at 99 (reversing mail and wire fraud convictions where "the jury must have resorted to rank speculation"). "[S]peculation," which cannot support a conviction even if it is "reasonable," "occurs when the finder of fact concludes that a disputed fact exists that is within the realm of possibility, but the conclusion reached is nevertheless unreasonable because it is not logically based on another fact known to exist." Pauling, 2019 WL 2220129, at *4. This perfectly describes the Government's risk-of-harm theory. That theory, on which the Government's wire fraud and conspiracy charges hinged, required that the supposedly rigged RFP excluded developers that could have offered Fort Schuyler a better deal -- a fact "not … known to exist"

-38-

because the Government failed to prove it.  Id.  Even if such exclusion were "'likely' or 'probable'" -- which it was not -- that would still not establish guilt "beyond a reasonable doubt."  Id. at *8.[33]

Second, the Government's witnesses -- who effectively proved the defendants' lack of guilt -- uniformly testified that the Syracuse RFP was not tailored to COR, and that each of its provisions was appropriate, procompetitive, and in Fort Schuyler's best interests, including those provisions that the Government argued favored COR.  See supra, pp.11, 19-20.  The lack of tailoring was corroborated by the fact that the same supposedly tailored provisions appeared in RFPs throughout the state where COR did not compete.  Compare A1670-84 (Syracuse) with A1909-27 (Buffalo), A1885-1908 (Marcy Nanocenter), A2218-36 (Rochester), A2237-57 (Rensselaer), A2258-85 (Plattsburgh); see also A1168.

---

[33] Pauling is instructive.  There, the disputed issue was whether the charged conspiracy involved at least 100 grams of heroin.  The Government indisputably proved at least 89 grams, and offered evidence to support the additional required amount, including a call seemingly referencing a 14-gram transaction and proof of a close working relationship between the co-conspirators suggesting a conspiracy that extended well beyond 100 grams.  The Court held that this evidence was insufficient because it required the jury to engage in speculation.  Like Pauling, the fact at issue here is a quantifiable one: whether Fort Schuyler was prevented from doing business with at least one competitor offering better value than COR.  Also like Pauling, the Government failed to prove this fact, offering only speculation (even more so than in Pauling because it presented no evidence whatsoever of excluded developers or the deals they would have offered on any of the projects).

Third, the RFP underwent multiple layers of drafting, review, and approval within Fort Schuyler (including by its Board Chair and procurement staff) and by outside counsel, and there was no evidence of any objections raised by those parties or pressure applied by the defendants. A1050, A1080, A1152-55, A1572-74, A1650, A1715-18, A2542-57. Thus, if the RFP did screen out any developers (even though none were identified), it was because they lacked qualifications that Fort Schuyler valued.

Fourth, even assuming that qualified companies were prevented from becoming Preferred Developers (which they were not), the alleged wire fraud scheme did not deprive, or seek to deprive, Fort Schuyler of its ability to contract with them if it did not obtain what it wanted from COR.

Fifth, as discussed in the previous section, Fort Schuyler received from COR everything it bargained for, and -- because there was no deceit regarding COR's qualifications, experience, fees, or quality/scope of work -- was never at risk of receiving less. See Finazzo, 850 F.3d at 115 (noting that there is no fraud where "customers freely bargained for a service and received that service"); Binday, 804 F.3d at 570 ("Thus, we have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain.").

In short, the Government failed to prove its theory that the alleged tailoring of the Syracuse RFP posed an actual (rather than hypothetical) risk of harm to Fort Schuyler through the covert elimination of competition. See Regent, 421 F.2d at 1182 (holding that the fraud statute "require[s] evidence from which it may be inferred that some <u>actual injury</u> to the victim, however slight, is a <u>reasonably probable</u> result of the deceitful representations if they are successful" (emphasis added)); <u>Starr</u>, 816 F.2d at 100 (reversing mail and wire fraud convictions because the alleged harm was, at most, "metaphysical"). To summarize, the RFP was generic, and no better or cheaper developers were actually prevented from becoming Preferred Developers; even if one assumes (contrary to the evidence) that such developers were excluded, their exclusion would have been based on reasonable qualifications that Fort Schuyler valued; and even assuming (again, contrary to the evidence) that better/cheaper developers with valued qualifications were excluded, Fort Schuyler could still contract with them if it did not like the terms offered by COR. Accordingly, there was no risk whatsoever of "tangible economic harm," <u>Finazzo</u>, 850 F.3d at 112, and therefore no basis for wire fraud/wire fraud conspiracy liability.[34]

---

[34] Because the charged scheme did not pose a risk of economic harm, there can be no finding of an intent to commit wire fraud. See <u>Novak</u>, 443 F.3d at 159 ("Here, as in <u>Starr</u>, the contractors received all they bargained for, and Novak's conduct did not affect an essential element of those bargains. Without more, the evidence is insufficient to show the requisite intent to harm."); <u>Starr</u>, 816 F.2d at 99 (no intent

The cases on which the Government primarily relied below -- Finazzo, Binday, and Viloski -- do not help it, as each involved clear economic harm. In Finazzo, the Government proved that the kickback-paying vendor the defendant selected "provided inferior products and charged higher prices than other vendors." 850 F.3d at 113; see also A877 (district court stating that it was "a lot easier to see … the economic harm" in Finazzo than in the present case). In Binday, the defendants deceived insurance companies into believing that the stranger-oriented life insurance policies defendants had purchased were not in fact stranger-oriented, thus causing the insurance companies to issue policies with "economic characteristics" they did not agree to, "impair[ing] profitability." 804 F.3d at 573. In Viloski, the defendant served as a consultant for Dick's Sporting Goods. The evidence showed that, on some transactions, he "did no consulting work, but accepted a consulting fee [from Dick's] that he passed on to" his codefendant, the Dick's officer who retained him. 557 F. App'x 28, 31 (2d Cir. 2014). In affirming

_____

to harm where defendants "in no way misrepresented to their customers the nature or quality of the service they were providing"); Regent, 421 F.2d at 1182 ("[W]e conclude that the defendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception."). And because conspiracy requires the criminal intent necessary for the substantive offense, United States v. Feola, 420 U.S. 671, 686 (1975), the Government's failure to prove a risk of economic harm dooms both the substantive wire fraud count and the wire fraud conspiracy count.

Viloski's conviction, this Court concluded that the deprivation of information regarding the kickbacks was material "because Dick's could have negotiated better deals for itself" had the officer not awarded business to Viloski for personal profit. Id. at 34.

In the present case, there was no remotely similar risk of harm. Unlike in Finazzo, there was no showing that COR "provided inferior products [or] charged higher prices," 850 F.3d at 113; unlike in Binday, Gerardi neither misrepresented the product being purchased nor "impair[ed] profitability," 804 F.3d at 573; and unlike in Viloski, there were no kickbacks, Fort Schuyler knew exactly what it was getting for its money, and it was not prevented from "negotiat[ing] better deals for itself," 557 F. App'x at 34.

## III. GERARDI'S WIRE FRAUD AND WIRE FRAUD CONSPIRACY CONVICTIONS MUST BE OVERTURNED BECAUSE THE DISTRICT COURT DENIED HIM HIS CONSTITUTIONAL RIGHT TO PRESENT A MEANINGFUL DEFENSE

Critical to the trial strategy of Gerardi and his codefendants was the planned introduction of evidence demonstrating that COR and LPC were highly qualified companies that performed to Fort Schuyler's utmost satisfaction at a fair price. The defendants argued that such evidence was relevant to show that Fort Schuyler received exactly what it bargained for, that the defendants operated in good faith with no intent to cause any risk of harm, and that COR and LPC well deserved their Preferred Developer status. ECF Nos. 656, 657 at 2-3, 661 at 7-11; A878-84. The

district court improperly excluded this evidence under the flawed belief that it was irrelevant.  A997-1009, A1127-29, A1131, A1292.  The district court reasoned: "Not getting the benefit of the bargain is breach of contract.  Getting it is neither here nor there in a right-to-control case."  A1292.

This is plainly wrong for two reasons.  First, this Court has repeatedly explained that getting the benefit of the bargain is a highly relevant -- in fact, dispositive -- consideration in a "right to control" case.  See, e.g., Finazzo, 850 F.3d at 115 (noting that there is no fraud where "customers freely bargained for a service and received that service"); Binday, 804 F.3d at 570 ("Thus, we have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain."); Novak, 443 F.3d at 159 (reversing mail fraud conviction because purported victims "received all they bargained for"); Starr, 816 F.2d at 99 (no mail or wire fraud where "customers received exactly what they paid for"); Regent, 421 F.2d at 1179 (no scheme to defraud where "false representations [were] not directed to the … nature of the bargain").

Second, relevance is a "very low standard," United States v. Al-Moayad, 545 F.3d 139, 176 (2d Cir. 2008), and there is no question that the quality of the defendants' performance was relevant to their argument that they operated in good faith, deserved to be Preferred Developers, and ultimately delivered as promised.

See <u>United States v. Litvak</u>, 808 F.3d 160, 190 (2d Cir. 2015) (because good faith "may be only inferentially proven, no events or actions which bear even remotely on its probability should be withdrawn from the jury" unless it is overwhelmingly "tangential and confusing").  The district court allowed the Government to introduce evidence of COR and LPC's fees and to suggest that these fees were higher than potential competitors (although the Government could not point to a single competitor at <u>any</u> fee level that was prevented from becoming a Preferred Developer).  A1472-73.  Yet it precluded the defendants from mentioning the extraordinary work they provided in exchange for their fees.  Given that risk of harm is a necessary element of wire fraud, and quality of performance is a critical component of harm (especially for Fort Schuyler, which often valued quality over price (A1134)), the preclusion of evidence regarding COR and LPC's performance is unjustifiable.  The district court never justified it on Rule 403 grounds, nor could it have: evidence about the value received by Fort Schuyler would not have distracted or confused the jury.  Indeed, such evidence goes to the heart of what this case should have been about.  <u>See</u> <u>Takhalov</u>, 827 F.3d at 1315-16 (holding that a scheme to defraud requires the jury to find "that the defendants had schemed to lie about [] quality or price").

The district court ruled that the defendants could offer evidence of their performance <u>only</u> if they "prove[d] that there [wa]s no way [the projects] could have

been done at a lower price, and that the quality couldn't have possibly been better." A1002.[35] This unattainable standard was patently unfair, especially given that the district court: (1) did not require the Government, who bore the burden of proof, to show that the projects awarded to COR and LPC could have been done at a lower price or with better quality; and (2) permitted the Government to introduce testimony from two developers (neither of whom sought to compete for the Syracuse RFP nor lacked the qualifications to become a Preferred Developer) regarding their typical fees, even though the court acknowledged that these developers could not say whether they would have charged less than COR or LPC on the specific projects at issue in this case, and neither developer could testify that they would have performed better. A1291, A1313.

The district court's improper exclusion of powerful -- and clearly relevant -- exculpatory evidence denied Gerardi his constitutional right to a "meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quotations omitted). "In order to uphold a verdict in the face of an evidentiary error, it must be highly probable that the error did not affect the verdict." United States v. Stewart, 907 F.3d 677, 688 (2d Cir. 2018) (quotations omitted). This Court has "repeatedly held that the strength of the government's case is the

---

[35] See also A1002 (requiring defendants to prove that "no one could have done this job at a different price and this was the world's best project").

most critical factor in assessing whether error was harmless." United States v. McCallum, 584 F.3d 471, 478 (2d Cir. 2009). Given the weakness of the Government's case, which the district court itself recognized (see A1130 (finding that "this [wa]s a very difficult case for the government")), the multiple days of jury deliberation, and the important nature of the precluded evidence, it is certainly not "highly probable" that the evidentiary error had no effect on the verdict. Accordingly, Gerardi's wire fraud and wire fraud conspiracy convictions must be overturned. See Stewart, 907 F.3d at 686-92 (vacating conviction due to improper exclusion of defense evidence); United States v. Scully, 877 F.3d 464, 473-76 (2d Cir. 2017) (same).

## IV.  GERARDI'S WIRE FRAUD CONVICTION MUST BE REVERSED FOR LACK OF VENUE

Gerardi's wire fraud conviction must be reversed for the additional reason that the Government failed to establish venue in the Southern District of New York.

Because venue must have been "freely chosen by the defendant," United States v. Davis, 689 F.3d 179, 186 (2d Cir. 2012) (quotations omitted), it "is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." United States v. Svoboda, 347 F.3d 471, 483 (2d Cir. 2003). In addition, "[w]here guilt of a substantive offense is premised on aiding and abetting, venue is proper where the

defendant's accessory acts were committed or where the underlying crime occurred." United States v. Lange, 834 F.3d 58, 69 (2d Cir. 2016) (quotations and alterations omitted).  None of these conditions is satisfied here.

The Government relied on a single communication to establish venue for the wire fraud count under which Gerardi was charged: an attempted phone call by Aiello to Howe on August 15, 2013, when Aiello happened to be passing through New York City.  A1393-94, A1406, A1414, A1938.  This attempted call was not listed in the Government's bill of particulars, which prejudiced Gerardi due to the lack of notice.  A1404.  Moreover, because it was an unconnected call made by Aiello during a random personal trip through New York City, it was neither foreseeable by Gerardi nor in furtherance of the alleged scheme to defraud.  Thus, it does not demonstrate that Gerardi "freely chose[]" venue in the Southern District of New York.  Nor does it constitute "substantial contacts" in the district, which is required in order to "comport with constitutional safeguards."  Davis, 689 F.3d at 186.  Accordingly, Gerardi's wire fraud conviction must be reversed.[36]

---

[36] The Government offered the August 15, 2013 call into evidence before it rested. Because it rested without offering any evidence whatsoever of venue on the Buffalo wire fraud count (which did not pertain to Gerardi), it asked to reopen its case on that one count.  A1393-94.  The district court permitted this extraordinary request (A1398) and gave the Government several days to compile new venue-related evidence (A1397), but it made clear that its decision was limited to the Buffalo count.  A1394, A1397 (telling Aiello's counsel that he did not "have a dog in the fight" because "[t]he issue is whether I reopen the case for Buffalo").  In its reopened case, the Government ignored this ruling and offered wires relating to Syracuse.

## V. GERARDI'S FALSE STATEMENT CONVICTION MUST BE VACATED DUE TO PREJUDICIAL SPILLOVER FROM THE INVALID WIRE FRAUD AND WIRE FRAUD CONSPIRACY COUNTS

In addition to wire fraud and wire fraud conspiracy, Gerardi was convicted of falsely "denying involvement in tailoring the Syracuse RFP for the benefit of" COR. A872-73. Because the wire fraud and conspiracy convictions must be overturned for each of the reasons set forth above (see Sections I-IV, supra), the false statement conviction must be vacated due to the spillover prejudice from those counts.

"[W]hen evaluating taint or spillover effect, courts have applied a test somewhat favorable to the defendant." United States v. Murphy, 323 F.3d 102, 122 (3d Cir. 2003). The operative inquiry is whether this Court is "unable to conclude that [Gerardi's] conviction on the [] § 1001 count[] did not result from a spillover from" the evidence and arguments on the reversed counts. United States v. Rooney, 37 F.3d 847, 857 (2d Cir. 1994) (emphasis added).[37] Thus, vacatur is required

---

A936-41 (describing new Syracuse-related Government exhibits, A1965-2217). Not only were these communications erroneously admitted, as they were outside the scope of the Government's reopened case, but none involved Gerardi or "substantial contacts" with the Southern District of New York.

[37] See also United States v. Berkery, 889 F.2d 1281, 1285 (3d Cir. 1989) ("[W]e cannot say that we are convinced that the jury could not have seized the defendant's admission to Counts 1 and 15 and used those admissions to convict Berkery of Counts 2-14." (emphasis added)); People v. Cepeda, 851 F.2d 1564, 1568 (9th Cir. 1988) ("As we are unable to conclude that this evidence [on the invalid count] did not influence the jury's verdict on the other counts of the indictment, we will order a new trial on all counts." (emphasis added)).

whenever spillover prejudice cannot be ruled out. Here, such prejudice is more than just possible (which is all that must be shown); it is abundantly clear. See id. (vacating conviction on two false statement counts on the grounds that defendant's conviction on these counts could have been the result of prejudicial spillover from wrongful conviction on corrupt solicitation count); United States v. Bruno, 383 F.3d 65, 91 (2d Cir. 2004) (vacating false statement conviction due to prejudicial spillover from reversed RICO count).

"In evaluating a claim of prejudicial spillover of evidence from an invalidated count, courts look to several factors in determining whether the totality of the circumstances requires reversal of some or all of the remaining counts." Rooney, 37 F.3d at 855. Those factors, individually and collectively, compel a finding of prejudicial spillover in this case.[38]

### 1. The Wire Fraud and Conspiracy Counts Likely Affected the Jury's View of the False Statement Count

The first factor is whether "the reversed count[s] would have tended to incite or arouse the jury into convicting the defendant on the remaining count[]." Id. This factor cuts strongly in Gerardi's favor. The wire fraud and conspiracy counts fundamentally affected the nature of the trial. Without them, the trial would simply

---

[38] Importantly, a defendant may establish prejudicial spillover based solely on one factor. See Bruno, 383 F.3d at 91 (vacating false statement conviction due to strength of a single factor).

have been about whether Gerardi's statement regarding tailoring was false. The lawfulness of the alleged tailoring would not have been in question, and -- given the lack of fraud charges, the absence of procurement rules, and the industry practice of developers shaping RFPs on which they bid -- the jury would have had no basis for assuming any underlying illegality. This is critically important for two reasons. First, absent a claim that the alleged tailoring was illegal, the jury would have been far less likely to infer that Gerardi had intended to lie about it. Indeed, a rational jury would have had reasonable doubt as to Gerardi's intent to lie if there had been no crime to conceal. See United States v. Poindexter, 727 F. Supp. 1470, 1475 (D.D.C. 1989) (agreeing with defendant that "absence of ... motive would ... refute the claim" that he possessed criminal intent).[39]

Second, the constant invocation of fraud and conspiracy throughout the trial necessarily tainted the jury's view of the false statement count and had the natural effect of arousing its ire. Old Chief is instructive on this point. In Old Chief, the Supreme Court noted how, in order to "convince the jurors that a guilty verdict would be morally reasonable," the prosecution will seek "not just to prove a fact but to establish its human significance." 519 U.S. 172, 187-88 (1997). Here, the

---

[39] A trial on the false statement count alone would have required a very different defense strategy, including one that emphasized the absence of motive. This further supports a finding of prejudicial spillover. See Murphy, 323 F.3d at 118 (prejudicial spillover may be found where "the elimination of the invalid count significantly changed the strategy of the trial" (quotations omitted)).

"human significance" of the alleged RFP tailoring would have been radically different without the wire fraud and conspiracy allegations: such tailoring would have been perceived as a relatively mundane feature of a procurement process, rather than a criminal scheme requiring a cover-up.

Moreover, the Government's presentation of the wire fraud and conspiracy counts heightened their prejudicial effect on the jury's consideration of the false statement count. As in Rooney, the Government's depiction of Gerardi with respect to the alleged scheme to defraud "had a decidedly pejorative connotation that was of the sort to arouse the jury." Rooney, 37 F.3d at 856 (quotations omitted). In Rooney, this Court found such a connotation (thus supporting the first prejudice factor) from a single statement by the prosecution: "Mr. Rooney was trying to take advantage of people who were less able to control their own destiny than he was, and he should be found guilty of the offenses charged." Id. The present trial featured countless statements by the prosecution that were far more pejorative than this. For example:

- "These men did not want to play by the rules. They were not willing to play fair or honest. They did not want to give anyone else a fair shot at these projects, at the millions and millions of dollars being offered up by the State of New York, so they wired it. They used their inside guy, Alain Kaloyeros, to make sure that they all got what they wanted, and they committed fraud." A1474.

- "This is a case about lying and cheating to get huge state construction contracts worth hundreds of millions of dollars, all paid for by the taxpayers of New York." A1012.

- "[T]hese men, the men sitting at these tables -- Kaloyeros, Ciminelli, Aiello, and Gerardi -- they could not hide what they did. They lied and deceived and committed fraud so that millions of dollars of state funds would find their way to their pockets. The State of New York trusted Alain Kaloyeros with all of that taxpayer money, and he abused that trust. Working with Todd Howe, Kaloyeros rewarded Howe's clients with that money. He made sure that the money went to their friends, or BFFs, as he called them. And he and those men, the men sitting behind me, committed a federal crime -- fraud -- to do it." A1452.

- "So the four defendants decided to trick and defraud the non-profit. And you'll learn that their scheme worked. And why did they do that? Why did they conspire together to cheat and corrupt the competition? Well the answer for Ciminelli, Aiello, and Gerardi is obvious: These state contracts were worth hundreds of millions of dollars to their companies." A1013.

The Government, in a long-winded analogy, even went so far as to equate the defendants' alleged deceit to that of a cheating spouse. A1541.

If the lone reference to the defendant in Rooney as "trying to take advantage of people who were less able to control their own destiny than he was" was enough to incite or arouse the jury to convict on two false statement counts, so too were the numerous highly inflammatory accusations against Gerardi relating to the alleged wire fraud scheme. In fact, because the Government accused Gerardi of fraudulently obtaining contracts funded by New York state taxpayers -- a group that included the jurors -- the tendency to incite and arouse was far greater here than in Rooney.

## 2. A Trial on the False Statement Count Alone would have Featured a Much Different Set of Evidence

Second, courts assessing prejudicial spillover "look to the similarities and differences between the evidence on the reversed count[s] and the remaining count[]." Rooney, 37 F.3d at 855. Prejudice is more easily found where, as here, this evidence is neither identical nor completely distinct. Id. at 855-56. Indeed, the false statement count was about RFP tailoring, the very conduct at issue in the wire fraud and conspiracy counts; yet the vast majority of the evidence pertaining to the wire fraud and conspiracy counts (including the most inflammatory) would have been inadmissible in a trial focused solely on the false statement count. See id. at 856 (finding prejudicial spillover where most of the evidence supporting the reversed count was inadmissible with respect to the false statement counts); United States v. Wright, 665 F.3d 560, 575 (3d Cir. 2012) (vacating counts of conviction due to prejudicial spillover where "much of the evidence at this trial would be inadmissible at a hypothetical trial on [the non-reversed counts] alone"). The Government's case regarding the Syracuse RFP (the subject of the charged false statement) consumed a fraction of the overall trial evidence and provided virtually none of the inflammatory material.[40]

---

[40] The district court candidly acknowledged that the evidence on the Syracuse side was "thinner" than on the Buffalo side. A1394.

The evidence that would have been inadmissible in a hypothetical trial focused solely on the false statement count includes:

1) the avalanche of documents and testimony relating to the Buffalo RFP (the vast bulk of the trial evidence), including Kaloyeros's email to Ciminelli that they needed to "fine tune the developer requirements to fit" (A1593) and his email to Howe that "these are not unique to [Ciminelli]'s company.. we need more definite specs, like minimum X years in Y, Z number of projects in high tech, etc, etc" (A1578), as well as emails from Schuler and another LPC employee regarding what could be construed as requests for RFP requirements unique to LPC (A1575-77, A1619);

2) the several days of testimony from Schuler about how he, Ciminelli, Kaloyeros, and Howe engaged in a criminal scheme to defraud (A1171-1288);

3) the days of testimony and troves of documents about how Kaloyeros and Ciminelli supposedly concealed their conduct through email deletion, use of personal gmail accounts, and disappearing Wickr messages (A1014-15, A1023-33, A1072-78, A1099, A1330-43, A1357-58, A1370-72, A1457-59, A1505, A1539-40);

4) the hours of testimony and numerous documents regarding the 50-year-experience requirement contained in the initial Buffalo RFP, and Kaloyeros's claim that this was a typo (A1052-53, A1061, A1063, A1071, A1090-91, A1098, A1109-10, A1145, A1166-67, A1200, A1206-07, A1240, A1241, A1243-44, A1280-81, A1283, A1296, A1309, A1322-24, A1348-49, A1352, A1355, A1423, A1455-56, A1467-68, A1495-96, A1531-33, A1539-42);

5) the lengthy testimony and arguments regarding the Buffalo RFP's vagueness, which was allegedly intended to hide the fact that a project worth hundreds of millions of dollars was up for grabs (A1014, A1036-39, A1042-45, A1051, A1062, A1071-72, A1086-87, A1105-06, A1110-11, A1150-51, A1193, A1196-97, A1203, A1208, A1214-16, A1219, A1242-43, A1249-50, A1282-83, A1287, A1296-1308, A1314-16, A1322, A1324-28, A1468-69, A1534-35, A1546);

6) nearly an entire day of testimony from two aggrieved developers complaining about the Buffalo RFP (A1295-1316, A1319-28);

7) the numerous email exchanges and witnesses discussing LPC's supposed involvement in selecting McGuire Development Company as the second Buffalo-area Preferred Developer (A1054-55, A1066, A1081-84, A1087-88, A1091-92, A1094-95, A1110-12, A1126, A1138-39, A1144, A1151, A1164-66, A1216-20, A1250-54, A1284-85, A1319, A1427-28, A1460-61, A1469, A1536-37, A1543);

8) the extensive testimony, emails, and arguments regarding Kaloyeros and Howe's respective relationships with Governor Cuomo, implying deep-seated corruption at the highest levels of state government (A1013, A1017-18, A1022, A1035-36, A1040, A1042, A1059-60, A1115-16, A1118, A1179-81, A1228-29, A1230-31, A1234, A1346, A1462-63, A1473, A1478, A1506); and

9) Kaloyeros's alleged lies to the public regarding Fort Schuyler's adherence to state procurement procedures (A1457) and its relationship with Howe (A1457).[41]

By overwhelming the jury with inflammatory evidence of his alleged co-conspirators' alleged fraudulent conduct, lies, and efforts to conceal the truth, the Government made it far more likely that the jury would view Gerardi as a liar who lied to federal officers. Most, if not all, of this evidence would have been absent at a trial on the false statement count alone.[42]

---

[41] The first seven categories in this list are unique to Buffalo. There was no similar evidence regarding the Syracuse RFP.

[42] Gerardi need not show that all of this evidence would have been excluded. Rather, it is enough that the district court "likely would exclude some of it." Wright, 665 F.3d at 576.

-56-

Further bolstering a finding of prejudicial spillover is the fact that "the prosecution encouraged the jury to consider the evidence on [the wire fraud and conspiracy counts] as bearing on [Gerardi's] culpability on" the false statement count. Rooney, 37 F.3d at 856. The Government lumped all of the alleged co-conspirators' alleged lies and misconduct together as proof that they were all guilty of the crimes charged.[43] Moreover, the fact that the jury's verdict was not selective supports the conclusion that the jury did not compartmentalize the evidence. See United States v. Hamilton, 334 F.3d 170, 183 (2d Cir. 2003) ("The absence of [prejudicial] spillover is most readily inferable where the jury has convicted a defendant on some counts but not on others.").

---

[43] See, e.g., A1015 ("After you have heard all of the evidence, it will be clear to you the reason for all the secrecy, for all the lies. It is because the defendants defrauded the SUNY nonprofit and duped it into picking the defendants' companies, and the defendants lied because they knew what they were doing was wrong, and they didn't want to get caught."); A1459 ("These defendants lied repeatedly and they lied to everyone. These are not normal ways of doing business. This is what you do when you're trying to cover up your tracks. Why would people lie, why do they hide things, why do they cover things up? Because they know they did something wrong. And in this case, the lies, the concealment, the destruction of evidence by these defendants are proof positive that they knew what they were doing was wrong, and that they are guilty.").

### 3. The Government's Case on the False Statement Count was Far from Overwhelming

The third factor is "the strength of the government's case on the count[] in question." Rooney, 37 F.3d at 856. Where, as here, the case "was not overwhelming," vacatur due to prejudicial spillover is appropriate. Id. at 857.

The statement attributed to Gerardi denying tailoring was as follows: "[Gerardi] stated that he did not ask for the RFP to be tailored to COR, nor did he feel as though it was tailored to COR." A1330. The only proof cited below by the Government regarding this statement's falsity was: (1) Howe's email to Gerardi and Aiello asking them "what do you think?" regarding the draft Syracuse RFP he had attached (A1650); (2) Gerardi's feedback that "[i]t would be more flexible" if developers could submit not only audited financial statements, but also "other financial information/statements that demonstrate the DEVELOPER'S financial qualifications" (A1665); and (3) Gerardi's email saying "Great, thank you" in response to Howe's notification that the financial statement provision was broadened as Gerardi had suggested (A1712). See A2642. This is far from overwhelming evidence that Gerardi's statement was false.[44]

First, this evidence does not demonstrate that Gerardi "asked" for the RFP to be tailored. It shows that Howe asked for Gerardi's thoughts on the RFP, and that

---

[44] In fact, the insufficiency of this evidence provides a separate, and compelling, basis for reversing the false statement conviction.

Gerardi responded by pointing out (correctly) that the RFP "would be more flexible" if the financial statement provision were slightly broadened.[45]

Second, the evidence does not show that Gerardi sought to tailor the RFP to COR. Just the opposite. As Gerardi noted both in his handwritten comments on the RFP (A1660) and in his email to Howe (A1665), audited financial statements were "typically prepared for not-for-profits or public corp[orations]," rather than for private developers. This notation would apply to <u>all</u> private developers, not just COR. Far from rigging the RFP, the expansion of the financial statement provision increased competition by encouraging potential bidders who might otherwise be deterred by the audited-financial-statement requirement.[46]

Finally, with respect to the last part of Gerardi's statement, the Government's witnesses uniformly corroborated his "feeling" regarding the RFP's lack of tailoring. <u>See, e.g.</u>, A1237 (Schuler testifying that "[f]or the most part" he found the RFPs "to be entirely generic" and "it didn't look like there was anything unique"); A1171

---

[45] Both the district court and the Government acknowledged that the alleged tailoring of the Syracuse RFP was not done at Gerardi's request. <u>See</u> A2638-39 (district court stating that "this scheme originated with and was nudged along by Howe"); A2647 (Government arguing that "it was really Kaloyeros's plan to rig these RFPs").

[46] Furthermore, as Gerardi explained in his interview with the Government, "COR Development could have easily obtained [audited financial statements] should they have had to." A1328. Thus, the expansion of the financial statement provision hardly enabled COR's success in the RFP process.

(Schell confirming that he "didn't see anything in [the RFPs] that indicated that these were tailored for anybody"); A1096 (Barber confirming that the RFP "appeared not to be tailored to anyone"). In fact, the Syracuse RFP was so generic, the same supposedly tailored provisions were included in RFPs issued throughout the state in regions where COR did not compete. Compare A1670-84 (Syracuse) with A1909-27 (Buffalo), A1885-1908 (Marcy Nanocenter), A2218-36 (Rochester), A2237-57 (Rensselaer), A2258-85 (Plattsburgh); see also A1168.

These critical details were likely lost on a jury inundated over the course of several weeks with inflammatory allegations about completely separate lies, fraud, and corruption. When viewed without the prejudice and distraction of the wire fraud and conspiracy counts, it is obvious that the evidence regarding the alleged falsity of Gerardi's statement was far from overwhelming.

*     *     *

In conclusion, if this Court reverses Gerardi's wire fraud and conspiracy convictions, it must also vacate his false statement conviction because, as the analysis above demonstrates, one cannot conclude that the false statement conviction did not result from spillover prejudice from the reversed counts. Indeed, such prejudice is obvious and overwhelming.

## VI. GERARDI'S FALSE STATEMENT CONVICTION MUST BE REVERSED DUE TO PROSECUTORIAL MISCONDUCT

Gerardi's false statement conviction cannot stand for an additional reason: it was impermissibly tainted by prosecutorial misconduct.

In 2016, during its criminal investigation, the prosecution assured Gerardi that he was not a "target," when in fact he was. A267 ¶ 6, A268 ¶ 13. This false representation was apparently made to lure him to the meeting where he allegedly denied tailoring the RFP. The prosecution's motivation can only be inferred because the district court improperly refused to hold a hearing to explore the issue, which it deemed irrelevant.[47]

Such extraordinary misconduct requires an extraordinary remedy. In United States v. Jacobs, 531 F.2d 87 (2d Cir. 1976), this Court affirmed a district court's dismissal of a perjury charge brought against the defendant based on her testimony before a grand jury on the ground that the Government attorney who questioned her failed to advise her that she was a target of investigation. The district court concluded that the defendant's due process rights had been violated. This Court did not reach the constitutional issue, but relied instead on its broad supervisory powers to dismiss the tainted charge. The Government appealed, and after a remand by the

---

[47] Ironically, the district court concluded that, when it comes to the Government, deceit that enables discussions with a counterparty should carry no consequences. SA46-47.

Supreme Court, this Court reaffirmed its earlier ruling.  <u>United States v. Jacobs</u>, 547 F.2d 772, 773-75 (2d Cir. 1976) (commenting that "[w]e abhor perjury, but the limited question is whether, in these particular circumstances, the prosecution was entitled to the luxury of a perjury count").  The same remedy of dismissal is warranted here.

## **CONCLUSION**

For the foregoing reasons, and for the reasons articulated by Gerardi's co-defendants-appellants,[48] the judgment should be reversed and the case remanded with instructions to enter a judgment of acquittal.  In the alternative, the judgment should be vacated and the case remanded for a new trial.

Dated:   New York, New York
         May 29, 2019

Respectfully submitted,

WALDEN MACHT & HARAN LLP

By:   <u>/s/ Milton L. Williams</u>
      Milton L. Williams
      Jacob Gardener
      Avni P. Patel
      One Battery Park Plaza, 34th Floor
      New York, New York 10004
      (212) 335-2030

*Attorneys for Defendant-Appellant*
*Joseph Gerardi*

---

[48]   Pursuant to Fed. R. App. P. 28(i), Gerardi joins in the arguments made by his co-defendants-appellants Aiello (Points IV-VI), Kaloyeros (Points I-III), and Ciminelli (Points I-III).

# <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 15,363 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman 14-point font.

Dated:    New York, New York
            May 29, 2019

                    Respectfully submitted,

                    WALDEN MACHT & HARAN LLP

                    By:    <u>/s/ Milton L. Williams</u>
                              Milton L. Williams
                              Jacob Gardener
                              Avni P. Patel
                              One Battery Park Plaza, 34th Floor
                              New York, New York 10004
                              (212) 335-2030

                    *Attorneys for Defendant-Appellant*
                      *Joseph Gerardi*