# 18-2990-cr(L), 18-3710-cr(CON), 18-3712-cr(CON), 18-3715-cr(CON), 18-3850-cr(CON)

## United States Court of Appeals
### *for the*
### Second Circuit

---

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

PETER GALBRAITH KELLY, JR., MICHAEL LAIPPLE, KEVIN SCHULER,

*Defendants,*

JOSEPH PERCOCO, STEVEN AIELLO, JOSEPH GERARDI, LOUIS CIMINELLI, ALAIN KALOYEROS, AKA Dr. K,

*Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT
## ALAIN KALOYEROS

BRUCE C. BISHOP
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

REID H. WEINGARTEN
MICHAEL C. MILLER
MICHAEL G. SCAVELLI
DAVID B. HIRSCH
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

*Attorneys for Defendant-Appellant Alain Kaloyeros*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................iv

JURISDICTION..................................................................................................1

ISSUES PRESENTED........................................................................................2

STATEMENT OF THE CASE.............................................................................4

    A.    Rulings Appealed ...............................................................................4

    B.    Facts..................................................................................................5

          1.    Preferred Developer Concept......................................................6

          2.    The Preferred Developer RFP Process .......................................7

          3.    Negotiation of Subsequent Development Projects ....................9

    C.    Procedural History.............................................................................11

          1.    The Charges: "Right to Control" Wire Fraud...........................11

          2.    Pretrial Rulings on Right to Control .........................................12

          3.    The Court's Preclusion of Evidence That FSMC Received the Benefit of Its Bargain ..........................................................13

          4.    Rule 29 Motions........................................................................14

          5.    Jury Instructions .......................................................................15

SUMMARY OF ARGUMENT .............................................................................15

ARGUMENT ........................................................................................19

I.    The "Right to Control" Wire Fraud Theory Cannot Sustain Kaloyeros's
      Conviction..................................................................................19

      A.    This Court Has Drawn a Clear Line Between Conduct Constituting
            Wire Fraud—Which Requires Intent to Cause Tangible Economic
            Harm—and Conduct That Merely Causes Someone to Transact
            With One Counterparty Over Another ................................................19

      B.    The Evidence Was Insufficient to Show a Risk of Tangible
            Economic Harm....................................................................................24

            1.    The government failed to prove that any misrepresentations
                  at the preferred developer RFP stage were capable of causing
                  tangible economic harm..........................................................25

            2.    The government's "hypothetical competitor" theory is
                  insufficient to overcome this lack of evidence ........................26

            3.    The district court's theory that misinformation regarding the
                  RFP process alone was fraud was insufficient to sustain
                  conviction................................................................................29

      C.    The District Court Denied Kaloyeros the Right to Present a
            Defense ...............................................................................................30

            1.    The district court wrongly prohibited Defendants from putting
                  on their defense that FMSC received the benefit of its
                  bargain.....................................................................................32

            2.    The district court compounded its error by admitting
                  misleading evidence regarding project cost.............................35

D. At a Minimum, Kaloyeros Is Entitled to a New Trial Before a Properly Instructed Jury ........................................................38

    1. The court did not instruct that if the company received (and was intended to receive) the full economic benefit of its bargain, that is not wire fraud ....................................................39

    2. The court did not adequately instruct that Defendants must have intended to cause tangible economic harm ......................39

    3. The court's instruction removed limiting language cabining the right-to-control theory..........................................................42

    4. The court's instruction on "potentially valuable economic information" does not cure the deficiencies in its instruction ..45

    5. The instruction errors were not harmless beyond a reasonable doubt...........................................................................................48

II. The "Right to Control" Theory Is Fatally Flawed........................................50

A. The Right to Control One's Assets Is Not Money or Property...........51

B. "Potentially Valuable Economic Information" Is Not Property In the Victim's Hands.................................................................................52

C. To Support a Wire Fraud Conviction, the Money or Property Must be Obtainable.........................................................................................54

III. The District Court's "No Ultimate Harm" Instruction Misled the Jury Regarding Good Faith and the Required Intent to Cause Harm ...................55

CONCLUSION .......................................................................................................59

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A).....................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*California v. Trombetta,*
    467 U.S. 479 (1984)..................................................................30

*Carpenter v. United States,*
    484 U.S. 19 (1987)....................................................................53

*Chambers v. Mississippi,*
    410 U.S. 284 (1973)..................................................................31

*Cleveland v. United States,*
    531 U.S. 12 (2000)..............................................................51, 53

*Crane v. Kentucky,*
    476 U.S. 683 (1986)............................................................30, 31

*Jackson v. Virginia,*
    443 U.S. 307 (1979)..................................................................24

*McNally v. United States,*
    483 U.S. 350 (1987)............................................................19, 51

*Neder v. United States,*
    527 U.S. 1 (1999)..........................................................38, 48, 59

*NOW v. Scheidler,*
    537 U.S. 393 (2003)..................................................................54

*Pope v. Illinois,*
    481 U.S. 497 (1987)..................................................................48

*Sekhar v. United States,*
    570 U.S. 729 (2013)............................................................52, 54

*Skilling v. United States,*
    570 U.S. 729 (2013)............................................................51, 54

*Sullivan v. Louisiana,*
    561 U.S. 358 (2009)..................................................................51

*United States v. Bah,*
    574 F.3d 106 (2d Cir. 2009)......................................................42

*United States v. Berkovich*,
   168 F.3d 64 (2d Cir. 1999).................................................................59

*United States v. Binday*,
   804 F.3d 558 (2d Cir. 2015)....................................................... *passim*

*United States v. Bravo-Fernandez*,
   913 F.3d 244 (1st Cir. 2019).............................................................28

*United States v. Bruchhausen*,
   977 F.2d 464 (9th Cir. 1992).............................................................52

*United States v. Carlo*,
   507 F.3d 799 (2d Cir. 2007)..............................................................21

*United States v. D'Amato*,
   39 F.3d 1249 (2d Cir. 1994).................................................39, 40, 42

*United States v. Davis*,
   726 F.3d 357 (2d Cir. 2013)..............................................................28

*United States v. Davis*,
   No. 13-cr-923 (LAP), 2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017)...........................23, 28, 33

*United States v. Dinome*,
   86 F.3d 277 (2d Cir. 1996).................................................21, 46, 57

*United States v. Ethridge*,
   948 F.2d 1215 (11th Cir. 1991)..........................................................34

*United States v. Ferguson*,
   676 F.3d 260 (2d Cir. 2011)........................................................57, 58

*United States v. Finazzo*,
   850 F.3d 94 (2d Cir. 2017)......................................................... *passim*

*United States v. Foshee*,
   578 F.2d 629 (5th Cir. 1978).............................................................35

*United States v. Gabriel*,
   125 F.3d 89 (2d Cir. 1997)...........................................................39, 40

*United States v. Heimann*,
   705 F.2d 662 (2d Cir. 1983).............................................................34

*United States v. Henry*,
   29 F.3d 112 (3d Cir. 1994)...............................................................52

*United States v. Jabar*,
   No. 09-CR-170, 2017 WL 4276652 (W.D.N.Y. Sept. 27, 2017) ....................................24, 28

*United States v. Johnson*,
   No. 16-CR-457-1 (NGG), 2017 WL 5125770 (E.D.N.Y. Sept. 21, 2017) ............................33

*United States v. Lange*,
   834 F.3d 58 (2d Cir. 2016)...................................................................................................57

*United States v. Lanier*,
   520 U.S. 259 (1997)..............................................................................................................51

*United States v. Leslie*,
   103 F.3d 1093 (2d Cir. 1997)...............................................................................................28

*United States v. Litvak*,
   808 F.3d 160 (2d Cir. 2015)............................................................................................34, 35

*United States v. Mejia*,
   545 F.3d 179 (2d Cir. 2008)..................................................................................................48

*United States v. Mittelstaedt*,
   31 F.3d 1208 (2d Cir. 1994)...................................................................................... *passim*

*United States v. Novak*,
   443 F.3d 150 (2d Cir. 2006)........................................................................................23, 33, 39

*United States v. Pauling*,
   __ F.3d __, 2019 WL 2220129 (2d Cir. May 23, 2019)....................................24, 27, 29, 44

*United States v. Quattrone*,
   441 F.3d 153 (2d Cir. 2006)..................................................................................................38

*United States v. Regent Office Supply Co.*,
   421 F.2d 1174 (2d Cir. 1970)................................................................................................22

*United States v. Rivera*,
   799 F.3d 180 (2d Cir. 2015)..................................................................................................31

*United States v. Rodolitz*,
   786 F.2d 77 (2d Cir. 1986)....................................................................................................21

*United States v. Rossomando*,
   144 F.3d 197 (2d Cir. 1998)...................................................................................... *passim*

*United States v. Sadler*,
   750 F.3d 585 (6th Cir. 2014) ..........................................................................................52, 53

*United States v. Shellef*,
    507 F.3d 82 (2d Cir. 2007).......................................................... *passim*

*United States v. Slay*,
    717 F. Supp. 689 (E.D. Mo. 1989).......................................................52

*United States v. Starr*,
    816 F.2d 94 (2d Cir. 1987).......................................................... *passim*

*United States v. Thomas*,
    32 F.3d 418 (9th Cir. 1994) ...............................................................35

*United States v. Valle*,
    807 F.3d 508 (2d Cir. 2015)...............................................................24

*United States v. Wallach*,
    935 F.2d 445 (2d Cir. 1991)...............................................................53

*United States v. Weingarten*,
    632 F.3d 60 (2d Cir. 2011)................................................................19

*United States v. Wiltberger*,
    18 U.S. (5 Wheat.) 76 (1820).............................................................51

**Statutes**

18 U.S.C. § 1343 ......................................................................................54

18 U.S.C. § 1951 ......................................................................................54

18 U.S.C. § 3231 ........................................................................................1

28 U.S.C. § 1291 ........................................................................................1

**Other Authorities**

Fed. R. App. P. 28(i) .................................................................................5

Fed. R. Evid. 401 ....................................................................................34

# JURISDICTION

The district court had criminal jurisdiction under 18 U.S.C. § 3231.  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

Judgment was entered December 12, 2018.  A153-154; SA108.  Defendant timely appealed on December 21, 2018.  A155; A2649-2651.

# ISSUES PRESENTED

Defendants were convicted of wire fraud offenses under the intangible-property theory of "right to control."  Although wire fraud requires "money or property" as the object of the fraudulent scheme, this Court has ruled that because the intangible interest in controlling one's assets is a protected property interest, fraud may exist where a scheme denies a victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions.  However, not every misrepresentation that could affect a decision to use assets is fraud.  This Court has repeatedly held that misrepresentation of information is not right-to-control fraud unless it is capable of causing, and intended to cause, tangible economic harm to the victim.

The issues presented are:

1.    District Court Errors Regarding Right to Control:

     A.    The government's only claim of economic harm was that Defendants' concealment of a noncompetitive *preliminary* developer selection process foreclosed the "possibility" that another developer *might* have offered "better value" on *subsequent* contracts.  The prosecution submitted no proof that the preliminary selection could or did have any effect on the terms of those subsequent contracts, and admitted it had no evidence that any other developer could have offered a better deal on any project.

     Is Kaloyeros entitled to acquittal because the evidence was insufficient to prove the charged misrepresentation was capable of causing tangible economic harm?

B.     This Court's right-to-control precedents hold that if the victim received (and was intended to receive) the benefit of the bargain, there is no fraud.  The district court ruled the benefit of the bargain irrelevant, and prohibited the defense from introducing any evidence that the alleged victim received what it paid for: high-quality buildings at reasonable cost.  That evidence was relevant to show the victim received the benefit of its bargain, and that Defendants lacked fraudulent intent and acted in good faith.

Was Kaloyeros denied his constitutional right to put on a defense?

C.     The district court refused to instruct the jury on numerous limitations on the right-to-control theory that are clearly established by this Court's precedents.

Is Kaloyeros entitled to a new trial by a jury properly instructed on the governing principles of law?

2.   Is the "right to control" theory of wire fraud fatally flawed:

A.     Because it does not require deprivation of tangible money or property?

B.     Because "potentially valuable economic information" is not property in the hands of the victim?

C.     Because "potentially valuable economic information" is not obtainable property?

3.   The district court gave a limiting instruction on good faith that this Court has held is obvious error unless the defendant raises a particular defense: the claim that, *despite* acting fraudulently, he nonetheless lacked culpable intent because he believed the victim would not ultimately be harmed.  No Defendant advanced that defense here.

Did the district court's limitation of the good faith defense deny Kaloyeros a fair trial?

## STATEMENT OF THE CASE

### A.     Rulings Appealed

Dr. Alain Kaloyeros, the former President of SUNY Polytechnic Institute, appeals his conviction, after jury trial before the Honorable Valerie E. Caproni, for wire fraud offenses in connection with technology development projects.  He was sentenced to 42 months' confinement and fined $100,000.  SA108-113.  Judge Caproni granted release pending appeal, finding "there is a substantial question relative to the government's right to control theory" here.  A2648.

Kaloyeros appeals the following rulings:

- The denial of his motion for judgment of acquittal;[1]

- The district court's refusal to allow him to prove that the putative victim received the full benefit of the bargain on its development projects (*i.e.*, high-quality, on-time, at-cost projects), which was a full defense to right-to-control fraud, and also relevant to show good faith and lack of fraudulent intent;[2]

- The court's jury instructions on the right-to-control theory of wire fraud;[3] and

- The court's jury instruction on good faith and "no ultimate harm."[4]

---

[1] A2647; *see* Sec. C.4, *infra* (proceedings below); Argument Parts I.B, II, *infra*.

[2] A997, A999-1002; A1127; A1130-1131; *see* Sec. C.3, *infra* (proceedings below); Argument Parts I.C, II, *infra*.

[3] A965, A980-983; *see* Sec. C.5, *infra* (proceedings below); Argument Parts I.D, II, *infra*.

[4] A983; *see* Sec. C.5, *infra* (proceedings below); Argument Part III, *infra*.

Kaloyeros also adopts the following arguments by his Co-Defendants-

Appellants, under F.R.A.P. 28(i):

- Aiello Br., No. 18-3710 (Con.): Parts IV, V, and VI (regarding right-to-control wire fraud, wire-fraud instructions, and right to present a defense) (except for Part IV.D, which is specific to Aiello);

- Ciminelli Br., No. 18-3712(Con.): Points I and II (regarding right-to-control theory and admission of evidence of other developers' fees);

- Gerardi Br., No. 18-3715(Con.): Parts I, II, and III (regarding right-to-control theory, insufficient evidence of right-to-control fraud, and denial of right to present a defense).

## B.    Facts

This case arose out of New York's effort to extend economic development

success in Albany to Buffalo and Syracuse.  Dr. Kaloyeros, a renowned researcher

who led the College of Nanoscale Science and Engineering and later SUNY-

Polytechnic, worked with several Governors to draw companies like IBM, AMD,

and Applied Materials to Albany, creating one of the nation's largest nanotechnol-

ogy research centers.  *See* A1047, A1059, A1346.  Governor Cuomo allocated

substantial funding (the "Buffalo Billion") to spur similar development in upstate

New York, and asked Kaloyeros to helm the project.  *See* A1036.

A key aspect of the successes in Albany was SUNY-Polytechnic's reliance

on private, not-for-profit companies to manage construction projects, because they

could move more "nimbly" than State procurement rules allowed.  A1041; A1056;

A1232.  As demonstrated in Albany, speed and flexibility were critical to meet the

needs of tech companies, who require quick execution in the rapidly-changing tech world.  A1142.  SUNY-Polytechnic's non-profit development arm was Fort Schuyler Management Corporation ("FSMC").  A1048.  Kaloyeros was a director of FSMC.  A1067.

### 1.  Preferred Developer Concept

A key part of the "Fort Schuyler model" was fostering partnerships with qualified construction firms embedded in particular communities that had construction business credibility, could promote FSMC's mission, and could keep up with the demanding schedules of the tech companies.  A1046; A1050; A1081.  And of course the purpose of the "Buffalo Billion" initiative was to spur local economic development.  *See* A1046; A1063.  FSMC thus relied on Preferred Developer RFPs (which functioned essentially as Requests for Qualifications ("RFQs")) to quickly (and preliminarily) identify qualified regional partners without project information attached.  A1284.

After this initial vetting, "Preferred Developers" could subsequently negotiate with FSMC for specific projects, but that status did not award them either projects or funds.  *See* A1670, A1679; A1909, A1918; A1062, A1065; A1231. Rather, the RFPs were considered "speculative," merely "one step in a process." A1066-1067.  The board would have "other opportunities to further determine if a project would move forward," and to approve pricing, once details of specific projects were known.  *Id.*  FSMC remained free to negotiate with other preferred

developer candidates, to accept or reject *any* proposals, to select multiple developers, or to cancel the entire process. A1670, A1679; A1909, A1918. And there was nothing that required FSMC to issue an RFP to select a developer for any specific project. A1050.

## 2. The Preferred Developer RFP Process

Kaloyeros asked FSMC's Chairman, Dean Fuleihan, to prepare Preferred Developer RFPs for the Buffalo and Syracuse regions. *See* A1563. Fuleihan enlisted an FSMC board member (Jerry Barber), FSMC's procurement director (Joseph Schell), and inside and outside counsel to assist with the drafting process. *See* A1063-1064, A1065; A1080, A1088-1089; A1572-1574; A2542-2557. When Fuleihan left FSMC during the RFP process, Barber replaced him as Chairman of FSMC's Board. A1055; A1163. Consistent with the Fort Schuyler model, the resulting RFPs included proposed qualifications that were general in nature, but sufficient to identify qualified partners who could negotiate for a role in subsequent development contracts. A1046; A1050, A1063-1066; A1081, A1088-1089.

Many of the qualifications ultimately included were drawn from earlier RFPs drafted by FSMC and a similar non-profit. *See* A1572. Indeed, FSMC used very similar qualifications for *both* Syracuse and Buffalo, and subsequently in Marcy, Plattsburgh, and Rochester. *See* A1092; A1167; A2218-A2285. Representatives from LPCiminelli (a Buffalo developer) and COR (a Syracuse develop-

er) suggested a few of the qualifications. *See* A1244; A1591; A1651-1666.[5] Receiving input from potential bidders was permissible and accepted, A1057; A1090; A1223, and LPCiminelli's suggestions would have "appli[ed] to any competent developer in western New York[.]" A1236. All qualifications in the RFPs were approved by Fuleihan and Barber. A1063-1065; A1088-1089. Both believed the terms suggested by LPCiminelli and COR were good for FSMC, because they added sensible standards for a potential partner, and/or permitted more applicants to participate in the RFPs. *Id.*

After the RFPs were finalized, Kaloyeros was barely involved in the Preferred Developer selection process. Schell, Fuleihan, and other staff advertised the RFPs, contacted potential bidders, set deadlines, and conducted conferences. *See* A1064; A1155-1156, A1162; A2540-2542. Kaloyeros was not present at board meetings where the RFP responses were discussed, and recused himself from selection of the Buffalo and Syracuse Preferred Developers. *See* A1068; A1082; A1143-1144; A2371, A2373, A2376-2378. Schell excluded one potential bidder without consulting Kaloyeros, A1159, A1161; A2523, but sought

---

[5] The government contended this developer input showed collusion to tailor the RFPs in favor of LPCiminelli and COR. *See, e.g.*, A1204-1207 (cooperating witness Kevin Schuler so testifying regarding LPCiminelli). The government made much of the fact that many of these communications occurred through personal email accounts, *e.g.*, A1197, and some referred to the developers as "friends" and to their qualifications as "vitals." A1560.

Kaloyeros's input on whether a different latecomer should be allowed to participate. Kaloyeros responded, "the more the merrier." A1148-1149.

An evaluation committee used a qualifications matrix to review the RFP responses. *See* A1804; A2518-2520. For Syracuse, only one bidder, COR, met all deadlines. A1163; A1804; A2528-2529. The committee agreed COR was qualified, and FSMC's board awarded COR preferred developer status. A1151; A1804. For Buffalo, three bidders met FSMC's deadlines. A1163. The committee agreed two companies, LPCiminelli and McGuire, were qualified, and awarded both preferred developer status. A1151, A1166. Committee member Barber testified that no one told him to select LPCiminelli or McGuire, and that he selected each in good faith. A1084, A1086. It was undisputed that LPCiminelli and COR were well qualified. A1045; A1225; A1804.

### 3. Negotiation of Subsequent Development Projects

After the Preferred Developers were selected, two FSMC executives, Jerry Barber and Thomas O'Brien, met to recommend developers for specific projects in Buffalo. A1570. Kaloyeros learned about the recommendations after selection was complete. *Id.* Two projects were available: the Silevo manufacturing plant (the "Riverbend Project") and an IBM facility (the "IBM Project"). *Id.* Barber and O'Brien concluded LPCiminelli was a "clear-cut" choice for the Riverbend Project because of its bonding capacity, its experience in public-private partnership construction, its experienced legal team, and its construction capacity. A1096;

A1570.  With the exception of public-private partnership experience, none of these qualifications were in the RFP's qualifications section, or suggested by LPCiminelli.  A1244.

In Summer 2014, Silevo was unexpectedly acquired by Solar City, and informed FSMC it intended to dramatically increase the size of its project and use the entire Riverbend site.  A1616; A1089-1090.  Kaloyeros and FSMC then worked to move the other potential Riverbend tenant's new facility to Syracuse.  A1090.  In addition, in March 2014, FSMC worked with a production company to develop a "Film Hub" to be constructed in Syracuse.  A1089.  For both projects, which arose *months after* the Syracuse Preferred Developer RFP, FSMC approached COR to undertake the projects.  *Id.*; A1421.

After these potential developers were approached, separate negotiations began for each project.  All parties were represented by counsel.  A1221.  The contracts were "negotiated at arm's length," "in good faith" based on the negotiators' expertise; "no one twisted any arms at Fort Schuyler."  A1096-1097.  A COR attorney described the negotiations as "protracted," "frustrating," and "difficult," adding that while other typical negotiations might last one month, negotiations with FSMC for one project lasted eighteen months.  A1421-1422.

## C. Procedural History

### 1. The Charges: "Right to Control" Wire Fraud

The Trial Indictment charged that Kaloyeros, Louis Ciminelli (Chairman and CEO of LPCiminelli), and Steven Aiello and Joseph Gerardi (President and General Counsel of COR) tailored the Buffalo and Syracuse RFPs to favor LPCiminelli and COR for selection as Preferred Developers. *See* A942, A951-955 (¶¶ 22, 24, 26).[6]  Critically, the RFPs were not for any development contracts themselves, but only for preliminary "Preferred Developer" status—which allowed chosen developers to negotiate for future development contracts, but did not itself entitle those developers to anything. *See* Sec. B.1, *supra*.  Based on this alleged scheme, the indictment charged two counts of wire fraud and one wire-fraud conspiracy count.  A951-955 (¶¶ 20-26).  The Indictment did not allege any pecuniary harm (actual or intended) to FSMC, instead charging only that the scheme was "to defraud Fort Schuyler of its right to control its assets, and thereby expose[] Fort Schuyler to risk of economic harm."  A952-954 (¶¶ 22, 24, 26).

---

[6] The original indictment charged two separate schemes—the one at issue here, and a separate scheme involving charged bribery, Hobbs Act extortion, and honest-services fraud.  *See* A163.  The court severed the two—trying the bribery-related charges (which did not involve Kaloyeros) in January 2018, and the right-to-control fraud charged here in July 2018.  Before the July 2018 trial, the government submitted a narrowed trial indictment containing only the charges against the four defendants on trial.  A942.

All convictions from the two separate trials are consolidated here under Defendant-Appellant Percoco's first-filed appeal.

There was no allegation or proof that Kaloyeros ever stood to gain monetarily from the charged scheme. *See* A947-950.

## 2. Pretrial Rulings on Right to Control

The parties engaged in extensive motions practice challenging the right-to-control theory. *See, e.g.*, A255-264; SA12 n.7. When asked by the court to articulate its right-to-control theory, the government asserted no actual harm or intended actual harm, only that Defendants intended "to expose Fort Schuyler to *the risk* of economic harm." A875 (emphasis added). The government theorized that Defendants had deprived FSMC of "the benefit of ... competition," so that FSMC "was denied the *possibility* even that another competitor would have come in with ... a better value proposition." *Id.* (emphasis added); *accord* A877.

Defendants rejoined that: (1) the RFPs awarded only Preferred Developer status, not any contracts or property, A875-878; and (2) this Court's cases hold that if a victim receives what it paid for, there is no fraud, A875. Defendants contended the government's reliance on the "possibility" some other developer "might" have offered "better value," A875, called for "a trial based on pure speculation." May 29, 2018 Tr. at 27 (ECF 719).

At a continued pretrial conference, the court ruled that "[i]n a right-to-control case the property interest at issue is the information that was misrepresented or withheld," and that "[i]nformation is property under this theory if it is potentially economically valuable." A996. The court confirmed the government's

- 12 -

trial theory was that "the board believed, their understanding was the competition if multiple developers were bidding would have given them better value, either a lower price or better quality or both." *Id*. Defendants objected that the board's belief was not enough and that the government had to prove FSMC actually "would've gotten better value." *Id.* The court countered, "No, ... that they believed competition would result in [better value]." *Id.*

### 3. The Court's Preclusion of Evidence That FSMC Received the Benefit of Its Bargain

The pretrial conference then turned to Defendants' contention that the government had to prove Defendants intended to cause FSMC economic harm.[7] Despite this Court's repeated statements that if a party receives the benefit of its bargain there is no fraud, the district court ruled that the benefit of the bargain was "not relevant." A997, A999. The court therefore precluded Defendants from offering proof that FSMC got the benefit of its bargain, *i.e.*, high-quality buildings at a fair price. A997, A999, A1001-1002.[8] It further ruled that the government need not show Defendants intended for FSMC to lose money; instead, it need only

---

[7] Though Ciminelli's counsel led this argument, A997, Defendants' arguments were received on a "one for all" basis. June 6, 2018 Tr. at 239 (ECF 856). This practice extended through the trial. *See, e.g.,* A1369; A1406.

[8] To make price or quality evidence relevant, the court ruled the defense would have to show the job could not possibly have been done at a lower price or better quality—"because otherwise you've deprived the board of knowledge that they could have gotten a better deal[.]" A1002.

prove intent "[t]o deprive [FSMC] of ... potentially valuable economic information," A997, *i.e.*, "the fact that it was not [a] … competitive process." A1000.

The court stuck to these rulings at trial. In the court's view, if the RFP process was tailored, that was fraud, whether or not there was any intent to deprive FSMC of the benefit of its bargain. *See* A1127. Counsel argued that high-quality, reasonable-cost work tended to show lack of intent to defraud, and proffered that the evidence would show the projects were "first-rate," "on time," and "on target from a cost perspective." A1128. But the court said it could not make even an initial finding of relevance: even if Defendants did "the best work in the world," the court saw no "logical link" between that and whether they "had an intent to defraud when they withheld information" that "Fort Schuyler would have wanted to know." A1130. When counsel pointed out, "It's relevant to good faith," the court responded, "No, that's propensity. That says … people who do a good job are not fraudsters. That's just not true." A1131. The court stuck to its ruling precluding any evidence that FSMC received the benefit of its bargain. *See id.*

### 4. Rule 29 Motions

The Defendants' motions for acquittal (A1377-1393) argued, among other things, that: the Preferred Developer RFPs were not property, and were not capable of causing economic harm to FSMC, A1381-1382 (Kaloyeros); A1391 (Gerardi); there was insufficient evidence the information about the RFPs had economic value to FSMC, A1386 (Aiello); and the government's "competition"

- 14 -

theory, and the right-to-control theory more generally, was insufficient to convict. A1386 (Aiello); A1392 (Ciminelli).[9]  Defendants renewed all their motions on all grounds, and the court reserved decision.  A1418, A1450.  The court denied Kaloyeros's motion at sentencing.  A2647.

### 5. Jury Instructions

Kaloyeros submitted proposed final jury instructions.  A888; *see* A908-914. The court issued a draft charge, A2562-2573, held a charge conference, A1428, A1438-1444, then issued two revised drafts.  A2574-2593.  Kaloyeros submitted written objections, A958-962, and additional oral objections, A1548-1549.  The court charged the jury after summations.  *See* A1554-1555; A978-983.  Before the jury retired, the court and counsel incorporated all previous objections.  A1559.

## SUMMARY OF ARGUMENT

### 1. The "Right to Control" Theory Cannot Sustain Kaloyeros's Conviction

All wire fraud offenses require "money or property as the object of the scheme," *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015), and "intent to cause some financial or property loss."  *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998).  This Court has drawn a clear line between cases that do or do not constitute right-to-control wire fraud.  Misrepresentation of information

---

[9] *See* note 7, *supra* (regarding "one for all" ground rule).  Ciminelli's counsel confirmed that all Defendants preserved their right-to-control arguments; the Court responded, "That's fine."  A1392.

cannot be right-to-control fraud unless it "can or do[es] result in tangible economic harm." *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017). The information must affect an essential element of the parties' bargain—either a party's economic calculus in the transaction, the benefits and burdens of the agreement, *Binday*, 804 F.3d at 570, or its ability to negotiate a better deal based on full information, *Finazzo*, 850 F.3d at 109. Where a company receives, and was intended to receive, the full benefit of its bargain, there is no fraud. *E.g.*, *Binday*, 804 F.3d at 570 & n.10. Likewise, where misinformation affects only the victim's choice to contract with a particular party, without affecting the value of any bargained-for element, that is not wire fraud. *Id.*

Here, the government made no claim that Defendants tried or intended to cheat FSMC of money or property in performing the development contracts. Instead, it charged only that Defendants deprived FSMC of its intangible right to control its assets, and thereby "exposed Fort Schuyler to risk of economic harm," by tailoring a preliminary RFP process that awarded no contracts or funds, but merely chose "preferred developers" who could negotiate for future development projects. A951-955 (¶¶ 22, 24, 26).

This theory is insufficient to sustain a wire fraud conviction: it amounted (at most) to inducing FSMC to choose one contractor over another, which does not, without more, constitute wire fraud. This Court's right-to-control precedents

require the government to prove more: that defendants misrepresented information capable of causing the victim tangible economic harm, with intent to cause such harm. Sec. I.A, *infra*. The government failed to do so—admitting it had no proof of such harm, and inviting conviction on pure speculation instead. Sec. I.B, *infra*.

The district court's endorsement of the government's fatally flawed theory denied Defendants a trial under correct principles of law. Despite this Circuit's repeated holdings that there is no fraud if the putative victim receives the benefit of its bargain, the court refused to allow Defendants to show FSMC received the benefit of its bargain here. Sec. I.C, *infra*. The court also refused correct instructions of law concerning: (1) the benefit of the bargain; (2) the requirement that Defendants intend to cause tangible economic harm, and (3) the strict limitations this Court has placed on the right-to-control theory. Instead, the court gave an instruction on "potentially valuable economic information" that was erroneous even under the Second Circuit case on which the court relied. Sec. I.D, *infra*.

As a consequence, Kaloyeros is entitled to acquittal, or, at a minimum, a new trial at which he may defend himself under correct principles of law, before a properly instructed jury.

## 2. The "Right to Control" Theory is Fatally Flawed

Even if the district court's right-to-control rulings and instructions had been correct under this Court's precedents, the right-to-control theory itself is fatally

flawed.  *First*, it does not require deprivation of tangible money or property.

*Second*, "potentially valuable economic information" is not property in the hands

of the victim.  *Third*, neither the victim's right to control his assets, nor "potentially

valuable economic information," are *obtainable* property, as the mail and wire

fraud statutes require.

To the extent *Finazzo* rejected these arguments, Kaloyeros preserves them

for further review.

### 3.     The District Court's "No Ultimate Harm" Instruction Misled the Jury Regarding Good Faith and Intent to Cause Harm

The district court instructed that if Defendants knowingly and willfully

schemed to deprive FSMC of potentially valuable economic information, any

belief "that eventually everything would work out so that FSMC would get a good

deal does not mean that the Defendant acted in good faith."  A1555.  "On its face,"

this instruction is "at odds with the requirement that a defendant must have

intended to harm his victim in order to be guilty of [wire] fraud[.]"  *Rossomando*,

144 F.3d at 201.  Here, Defendants' belief that "FSMC would get a good deal"—

*i.e.*, that it would receive everything it bargained for in the development con-

tracts—*was* good faith, *was* lack of fraudulent intent, and *was* "a defense to [wire]

fraud."  *Id.*

The court's "no ultimate harm" instruction lacked the necessary factual

predicate—an assertion by a Defendant that he lacked culpable intent because,

*even though he fraudulently deprived FSMC of something*, he believed "everything

would *eventually* work out" so that FSMC would not be harmed *in the end*.  No

Defendant made that claim—instead, Defendants argued they never intended to

harm FSMC *at all*, and FSMC *in fact never suffered* any harm.  In these circum-

stances, the "no ultimate harm" instruction was erroneous and prejudicial because

it misled the jury into thinking it could convict despite Defendants' lack of

fraudulent intent and their good faith.  *Rossomando*, 144 F.3d at 200-01.

## ARGUMENT

## I.    The "Right to Control" Wire Fraud Theory Cannot Sustain Kaloyeros's Conviction

Statutory interpretation questions are reviewed *de novo*.  *United States v.*

*Weingarten*, 632 F.3d 60, 63-64 (2d Cir. 2011).

### A.    This Court Has Drawn a Clear Line Between Conduct Constituting Wire Fraud—Which Requires Intent to Cause Tangible Economic Harm—and Conduct That Merely Causes Someone to Transact With One Counterparty Over Another

The mail and wire fraud statutes are "limited ... to the protection of property

rights."  *McNally v. United States*, 483 U.S. 350, 360 (1987).  "Money or property"

must be the object of the scheme to defraud.  *United States v. Binday*, 804 F.3d

558, 569 (2d Cir. 2015).  This Court has ruled that the intangible interest in

controlling one's assets is within the "property" protected by the statutes, and that

fraud may exist where a scheme "denies the victim the right to control its assets by

depriving it of information necessary to make discretionary economic decisions." *Id.* at 570. This right-to-control theory is the exclusive theory charged here.

"However, not every non-disclosure or misrepresentation that could affect someone's decision of how to use his or her assets is sufficient to support a mail fraud or wire fraud conviction." *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017) (citing *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994)). "The common thread of [this Court's] decisions is that misrepresentations or non-disclosure of information cannot support a conviction under the 'right to control' theory unless those misrepresentations or non-disclosures can or do result in tangible economic harm." *Id.* (citing *Mittelstaedt*); *accord Binday*, 804 F.3d at 570-71. "This economic harm can be manifested directly—such as by increasing the price the victim paid for a good—or indirectly—such as by providing the victim with lower-quality goods than it otherwise could have received." *Finazzo*, 850 F.3d at 111 (citing *Mittelstaedt*). "To give rise to liability, 'the information withheld either must be of some independent value or must bear on the ultimate value of the transaction.'" *Id.* at 109 (same). That is, it must affect an essential element of the bargain—either the company's economic calculus in the transaction, or the benefits and burdens of the agreement. *Binday*, 804 F.3d at 570.

This Court has repeatedly noted a clear line "between schemes that do no more than cause their victims to enter into transactions they would otherwise

avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007); *accord Binday*, 804 F.3d at 570. "[L]ack of information that might have an impact on the decision regarding where government money is spent, without more, is not a tangible harm and therefore does not constitute a deprivation of section [1343] 'property.'" *Finazzo*, 850 F.3d at 109 (quoting *Mittelstaedt*) (alterations omitted). "Rather, to convict, the government ha[s] to establish that the omission caused (or was intended to cause) actual harm to the [victim] of a pecuniary nature or that the [victim] could have negotiated a better deal for itself if it had not been deceived. *Id.* (quoting *Mittelstaedt*) (emphasis and alterations omitted).

Thus, the cases on the "fraud" side of this line have all involved misrepresentation of an element capable of causing economic harm, or affecting the economic calculus (*i.e.*, the pricing or value) of the transaction. *See United States v. Dinome*, 86 F.3d 277, 278-79 (2d Cir. 1996) (inflation of income to obtain a mortgage); *United States v. Rodolitz*, 786 F.2d 77, 80-81 (2d Cir. 1986) (submission of inflated insurance claims); *Binday*, 804 F.3d at 565-67, 573-74 (misrepresentation of insurance policies as a more valuable and marketable type of policy than they were); *United States v. Carlo*, 507 F.3d 799, 801-02 (2d Cir. 2007) (lying

that financing was imminent, to induce developers to continue projects at great expense and risk of failure); *Finazzo*, 850 F.3d at 96-97 (steering employer's purchases to vendor furnishing low-quality merchandise at inflated prices, in exchange for secret kickbacks). *Finazzo*, the one case where this Court found fraud based in part on the victim's inability to negotiate a better deal, 850 F.3d at 114, involved ample proof (absent here) that better deals in fact were available, because other vendors offered better prices and quality on the same merchandise. *See* 850 F.3d at 96-97, 100-02; *but see* Sec. I.B.2, *infra* (describing absence of "better deal" evidence here).

On the "no fraud" side of the line are cases that affected only the victim's choice to contract with a particular party, without affecting the value of any bargained-for element. This Court has repeatedly ruled: *those cases are not fraud*. *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179 (2d Cir. 1970) (sales representatives' misrepresentation of their identities, which were "not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain"); *United States v. Starr*, 816 F.2d 94, 98-99 (2d Cir. 1987) (bulk mail vendor did not defraud its customers where it delivered contracted-for services at contract price, even if it paid the post office a lower rate, because customers "received exactly what they paid for"); *Mittelstaedt*, 31 F.3d at 1216-17 (town officer's concealment of his interest in property while negotiating its sale to

the town would constitute fraud *only if* "the omission caused (or was intended to cause) actual harm to the village of a pecuniary nature *or* that the village could have negotiated a better deal for itself if it had not been deceived," but *not* if the lack of information merely induced the town to transact with him when it otherwise would not have); *Shellef*, 507 F.3d at 107-09 (no wire fraud where buyer's misrepresentation that it would not resell domestically merely "induced [the seller] to enter into a transaction that it would otherwise have avoided," but caused no "discrepancy between benefits reasonably anticipated and actual benefits received," and defendants did not contemplate actual harm to the seller); *United States v. Novak*, 443 F.3d 150, 153-54, 159 (2d Cir. 2006) (union officer's receipt of kickbacks from members was not fraud against employers, where the employers, "received all they bargained for, and [the officer's] conduct did not affect an essential element of those bargains").

The common thread of these latter cases—*which do not constitute mail or wire fraud*—is that the purported victim *received, and was intended to receive,* the full benefit of its bargain. *See Binday*, 804 F.3d at 570 & n.10. District courts following this jurisprudence have correctly concluded that where the customer "received 'exactly what [it] paid for, and there was no discrepancy between benefits reasonably anticipated and actual benefits received,'" there was no fraud.[10]

---

[10] *United States v. Davis*, No. 13-cr-923 (LAP), 2017 WL 3328240, at *15
(Continued …)

Thus, to sustain conviction, the government must prove that the misinformation was capable of causing tangible economic harm, and that defendants intended to cause tangible economic harm. Where the customer received, and was intended to receive, the full benefit of its bargain, there is no fraud.

## B. The Evidence Was Insufficient to Show a Risk of Tangible Economic Harm

The denial of a motion for judgment of acquittal is reviewed *de novo*, considering whether the evidence, viewed in favor of the verdict, is sufficient to permit a rational trier of fact to reasonably find all essential elements of the crime beyond a reasonable doubt. *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015). Speculation, even reasonable speculation, is insufficient to establish an element beyond a reasonable doubt. *United States v. Pauling*, __ F.3d __, 2019 WL 2220129, at *7 (2d Cir. May 23, 2019). "If 'reasonable' jurors 'must necessarily have a reasonable doubt' as to guilt," acquittal is required. *Jackson v. Virginia*, 443 U.S. 307, 318 n.11 (1979).

---

(S.D.N.Y. Aug. 3, 2017) (granting acquittal where the defendants never misrepresented "the nature or quality of the service they were providing" and "complete[d] the work as originally contracted"); *accord United States v. Jabar*, No. 09-CR-170, 2017 WL 4276652, at *9 (W.D.N.Y. Sept. 27, 2017) (granting acquittal where the UN "ended up with what it bargained for—an Iraqi radio station").

1. **The government failed to prove that any misrepresentations at the preferred developer RFP stage were capable of causing tangible economic harm**

To sustain a conviction under the right-to-control theory, the government had to prove the misinformation at issue was capable of causing, and intended to cause, tangible economic harm to FSMC.  Sec. I.A, *supra*.  Here, the government's charging theory and proof focused almost entirely on whether the Preferred Developer RFP process was competitive. But whether or not it was, that process could not cause tangible economic harm, because Preferred Developer status could not affect the elements of the subsequently negotiated development contracts.  The purpose of the RFP process was to select a *potential counterparty*, not to set the terms of later concrete transactions.

Preferred developer status undisputedly did not award any projects or set any contract terms.  As Board Chairman Fuleihan explained, winning the RFP "guaranteed [developers] the beginning of a partnership with [FSMC].  It did not guarantee that they would actually be awarded a contract to construct the ultimate project."  A1065; *accord* A1231 (Schuler agreeing that winning the RFP guaranteed Ciminelli "not one penny.").  Instead, a preferred developer still needed to be selected by FSMC for a specific project, and then negotiate the terms of an agreement with FSMC encompassing the details of that actual project.  *See* Statement of the Case Sec. B.1, *supra*; *accord* A1065.

At most, the government's evidence showed that the charged misrepresenta-tions affected FSMC's choice of whom to contract with, without affecting any essential element of any resulting bargain. This is not wire fraud. *See Shellef*, 507 F.3d at 108; *Mittelstaedt*, 31 F.3d at 1218; *Binday*, 804 F.3d at 570 & n.10; *Finazzo*, 850 F.3d at 109.

### 2. The government's "hypothetical competitor" theory is insufficient to overcome this lack of evidence

The government's *only* theory of tangible economic harm was that an uncompetitive RFP process "expose[d]" FSMC "to risk of economic harm," because of the "*possibility*" that some other hypothetical competitor *might have* "come in with ... a better value proposition." *See* A875 (emphasis added). But the government offered *no* evidence that any other developer could or would have offered FSMC better terms. It did not call any competing developer to testify that it could or would have offered FSMC "better value" on any project. Nor did any board member testify that any better deal was available to FSMC.[11]

This failure of proof stands in stark contrast to the ample evidence of better available deals presented in *Finazzo*, on which the district court relied. *See* A1291. In *Finazzo*, the government introduced abundant evidence that other vendors'

---

[11] Board members testified only that they believed a competitive process was important, and they would have wanted to know the RFP process was not competi-tive. A1054; A1134; A1319. That may show *materiality*, but it does not establish FSMC suffered tangible economic *harm*. *See* Sec. I.A, *supra*.

apparel was "of better quality and lower priced." 850 F.3d at 101. Witnesses

testified Aeropostale could have saved millions using overseas vendors; that the

kickback vendor's costs were "always high and their quality was subpar"; and

were accompanied by "egregious delivery delays" costing millions in sales. *Id.* at

100-02. Here, the government attempted no such proof. Instead, the prosecution

admitted it could not show that any competitor could have performed the projects

for less: "I can't tell you that those companies would have charged less than the 3.5

percent that LPCiminelli charged for Riverbend.... And I can't tell you they would

have charged less than the 6 percent that COR charged ... for the film hub and

Soraa." A1473. The government concededly *had no proof* of the only harm it

claimed: that FSMC could have gotten a better deal.

In place of proof, the government told the jury to use "common sense" to

conclude that favoring LPCiminelli and COR prevented any other competitor from

coming in and being "better." A1472. This is speculation, not evidence. *See, e.g.,*

*Pauling*, 2019 WL 2220129, at *4 ("Impermissible speculation ... is 'a complete

absence of probative facts to support the conclusion reached....' [M]ere speculation

[cannot be] allowed to do duty for probative facts."). A criminal conviction cannot

rest on "common sense" or inferences in the absence of *evidence* sufficient to

support those inferences beyond a reasonable doubt. *E.g.*, *id.* at *7-8 (upholding

Rule 29 acquittal, noting that even reasonable speculation cannot substitute for

proof beyond a reasonable doubt); *United States v. Leslie*, 103 F.3d 1093, 1102 (2d Cir. 1997) (reversing conviction where "the government did not provide even the slenderest of threads upon which to hang" inference of a required element).[12]

In *United States v. Bravo-Fernandez*, the First Circuit put the issue bluntly: "Suppose the government puts in no evidence about [an element] at all. Could jurors simply fill-in the gap based on their 'common sense' and 'general knowledge' ...?" 913 F.3d 244, 250 (1st Cir. 2019). The court answered: No. *See id.* at 250-51 (reversing conviction for insufficient evidence). Here, the government's urged substitution of "common sense" for evidence went to the heart of its right-to-control theory. Where its theory was that FSMC lost the opportunity of a better deal, it had to *prove* a better deal was available, and that misrepresentations about the RFP kept FSMC from obtaining it. The government did not even attempt such proof here.

---

[12] *Accord United States v. Davis*, 726 F.3d 357, 364-65 (2d Cir. 2013); *Starr*, 816 F.2d at 97-99, 101 (reversing conviction for insufficient evidence regarding tangible economic harm); *Davis*, 2017 WL 3328240, at *1 (granting Rule 29 acquittal); *Jabar*, 2017 WL 4276652, at *9 (same).

Defendants were prejudiced by the district court's refusal to instruct the jury that "[a]n inference is not a suspicion, guess, or speculation," but instead a "reasoned, logical" conclusion based on other proven facts, which is sufficient to convict only if it satisfies the reasonable doubt standard. *See* A898 (proposed instruction); A1551-1552 (refusing instruction); *Pauling*, 2019 WL 2220129, at *4-5 (confirming substance of instruction, and collecting cases).

It is no answer to argue "[t]he reason I can't say what those companies would have charged for these jobs is because this fraud worked." A1473 (prosecution closing). This naked accusation ignores the government's burden of proof. It was not the Defendants' burden to prove no other developer could or would have done a cheaper or better job.[13] It was the prosecution's burden to its theory of guilt beyond a reasonable doubt. *See, e.g.*, *Finazzo*, 850 F.3d at 109, 111; *Pauling*, 2019 WL 2220129, at *7-8; *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993). Throwing up its hands and claiming the "fraud worked" is not proof.

At best, the government's evidence showed FSMC's board members would have wanted to know if the RFP process was not competitive. *See* A1472-1473 (summation). But if all the government proved is that misinformation affected FSMC's decision to contract with the preferred developers rather than someone else, *that is not wire fraud. Mittelstaedt*, 31 F.3d at 1217; *Shellef*, 507 F.3d at 108.

### 3. The district court's theory that misinformation regarding the RFP process alone was fraud was insufficient to sustain conviction

The district court excused the government's lack of proof of tangible economic harm by ruling, contrary to this Court's precedents, that whether FSMC received the benefit of its bargain was wholly irrelevant, and that the government

---

[13] *But see* A1002 (district court stating defense needed to show just that in order to put on "benefit of the bargain" evidence).

need only prove that Defendants misled FSMC as to whether the RFP process was a competitive process.[14]  In the court's view the issue was not whether there was a discrepancy between what FSMC bargained for and what it received, but instead only whether the Defendants intentionally "withheld ... the fact that it was not [a] ... competitive process."  A1000.  According to the court, that was enough: unless the defense could prove that "there is no way this could have been done at a lower price, and that the quality couldn't have possibly been better," then FSMC was sufficiently harmed, because Defendants "deprived the board of knowledge that they could have gotten a better deal."  A1002.  The district court thus *assumed* what it was the government's burden to *prove*: that FSMC in fact could have gotten a better deal.[15]  That does not excuse the government's failure of proof.

### C.    The District Court Denied Kaloyeros the Right to Present a Defense

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *California v. Trombetta*, 467 U.S. 479, 485 (1984).  "Few rights are more funda-

---

[14] *See* Statement of the Case Sec. C.3, *supra*.

[15] The court did not require the government to prove FSMC "would [have] gotten better value," only that the board *believed* competition would have had that result.  A996-997.  The court *assumed* better value would have resulted, given that "we have an entire Sherman Act based on the theory that competition is generally good."  A997.

mental." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). That opportunity would be empty if the government or district court were permitted to exclude competent evidence central to the defendant's claim of innocence. *Crane*, 476 U.S. at 690.

The district court precluded Defendants from putting on any proof that FSMC received what it paid for—that the projects were completed on time, at the contracted-for price and quality.[16] This evidence was central to defending against the charges for two reasons. *First*, this Court has repeatedly made clear that if the putative victim received the benefit of its bargain, there is no wire fraud. *Second,* such evidence tended to show the Defendants never intended otherwise, and thus lacked intent to defraud and acted in good faith. The trial court's prohibition of this evidence denied Defendants their Fifth and Sixth Amendment rights to put on a defense.

Though evidentiary rulings are reviewed for abuse of discretion, application of constitutional standards is reviewed *de novo*. *See*, *e.g.*, *United States v. Rivera*, 799 F.3d 180, 184 (2d Cir. 2015).

---

[16] *See* Statement of the Case Sec. C.3, *supra*.

### 1. The district court wrongly prohibited Defendants from putting on their defense that FMSC received the benefit of its bargain

Until the pretrial conferences in this matter, Defendants were preparing to present evidence that FSMC received the full benefit of its bargain on each project, and thus there was no fraud under this Circuit's right-to-control precedents. Ciminelli, for instance, proffered he would prove that "[t]he Solar City facility was built on time and is high-quality work. Audits have found no evidence that costs were inflated. LPCiminelli's 3.5 percent fee was commercially reasonable, especially given the complexity of the task, the tight deadlines and the punitive liquidated damage provisions." A883. Kaloyeros would have relied on such evidence to show that FSMC received the benefit of its bargain and was not harmed, and that Kaloyeros had no intent to the contrary. *See* A1127-1128.

The district court foreclosed any such evidence, however, declaring it not relevant. Statement of the Case Sec. C.3, *supra*; A997-1002; A1127-1131. In the court's view,

> the defendants are accused of defrauding Fort Schuyler of the right to make a fully informed decision and not the right to a building that satisfied the terms of the development contracts. Not getting the benefit of the bargain is breach of contract. *Getting it is neither here nor there in a right-to-control case.*

A1292 (emphasis added).

The district court was dead wrong. This Court's right-to-control precedents make one thing clear: where a putative victim received the benefit of its bargain,

there was no fraud.  *See Binday*, 804 F.3d at 570 & n.10; *Shellef*, 507 F.3d at 108; *Novak*, 443 F.3d at 159; *Starr*, 816 F.2d at 98-99.  Far from being irrelevant, evidence that FSMC received the full benefit of its bargain was central proof of innocence of right-to-control fraud.

The district court's description of the sole issue as the victim's "right to make a fully informed decision" (A1292) is also flatly wrong.  Misrepresentations that only affect information a putative victim would have wanted to know, without more, are not mail or wire fraud.  *See* Sec. I.A, *supra*, at 20-21.  Thus, it was not enough merely to show the jury that FSMC would have considered the RFP information relevant to its decision; the government had to prove that information *harmed* FSMC, or was *intended to harm* FSMC, in a tangible economic way.  *See Finazzo*, 850 F.3d at 111.

Evidence that FSMC got what it paid for is centrally relevant to both actual and intended economic harm.  Its relevance to actual harm is self-evident: if the projects were high-quality, on time, and on budget, that is powerful evidence FSMC *did not* suffer economic harm.  *See, e.g.*, *Finazzo*, 850 F.3d at 111 (harm may be manifested by cost or quality); *id.* at 100-02, 103-04 (discussing evidence of such harm in that case).[17]  Its probative value on whether Defendants intended to

---

[17] *See also Starr*, 816 F.2d at 98-99; *Davis*, 2017 WL 3328240, at \*15-16; *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2017 WL 5125770, at \*7 (E.D.N.Y. Sept. 21, 2017).

cause FSMC harm is common sense: relevance is a low threshold under Federal Rule of Evidence 401, and "realistically, when the contested issue is intent, whether or not victims lost money can be a substantial factor in a jury's determination" of that intent. *United States v. Heimann*, 705 F.2d 662, 669 (2d Cir. 1983). As the Eleventh Circuit put it:

> If [the victim] had lost money, the government would likely have introduced that fact as evidence of intent to defraud... [T]he [defendants] are equally entitled to argue that the fact that [the victim] did not suffer a loss related to their intent, and present evidence to support that argument.

*United States v. Ethridge*, 948 F.2d 1215, 1217-18 (11th Cir. 1991) (per curiam). Defendants made the same "sauce for the gander" argument here, A1128, A1130, but the court said the inference ran in only one direction: if a contractor did "a terrible job, ... that tends to indicate a fraudulent intent, but it doesn't get the other way." A1130.

Indeed, because relevance is a low threshold, and intent to defraud or good faith may be proven by inference from circumstantial evidence (as the district court instructed here, A982), "no events or actions which bear even remotely on [good faith] should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh" its relevance. *United States v. Litvak*, 808 F.3d 160, 190 (2d Cir. 2015) (citation omitted). A district

court "exceed[s] its allowable discretion" by excluding evidence that could support "a reasonable doubt as to [a defendant's] intent to defraud." *Id.*[18]

The district court's wholesale exclusion of evidence that the projects were completed satisfactorily, on time, and at reasonable cost denied Defendants their constitutional right to present a defense that FSMC received the full benefit of its bargain, and they did not intend economic harm and acted in good faith.

### 2. The district court compounded its error by admitting misleading evidence regarding project cost

While barring Defendants from presenting evidence that the projects were high-quality, on-time, and reasonable-cost, the district court allowed the government to call representatives of two other developers to testify about alleged "typical" management fees, from which the government urged the jury to speculate that FSMC might have been overcharged. This misleading evidence, which Defendants were hamstrung to rebut, exacerbated the unfair prejudice.

Mark Balling, a representative of a developer that did not apply for FSMC projects, testified that a "typical[] fee was two to two and a half percent" for a project under $100 million and perhaps less for a larger project. A1297. Steven Bills, a representative of a developer that had proposed a 3-10% fee for FSMC's Rochester RFP, A1428, nonetheless testified that a "typical" construction man-

---

[18] *Accord United States v. Thomas*, 32 F.3d 418, 421 (9th Cir. 1994); *United States v. Foshee*, 578 F.2d 629, 634 (5th Cir. 1978).

agement fee "rang[ed] from 2 percent for extremely large projects to 4 to 5 percent for smaller projects."  A1322.

This "typical fee" testimony was *not* admitted to show those (or any) developers could or would have performed *these* projects for those fees.  Bills and Balling never examined the projects or contracts in question, and could not provide competent testimony about cost or fees for a contract that included the short timetables, contingency concessions, liquidated damages, or price guarantees at issue here.  A1311-1313; *see also* A2627.  The government disclaimed offering this testimony to show what the fees for FSMC's projects could or should have been, and the district court stated the testimony was inadmissible for that purpose.  A1260; A1291.  Instead, Balling's and Bills's testimony was purportedly admitted merely to show that other developers charged "a range of fees."  A1260.

Despite that limitation, the prosecution featured this testimony prominently in closing, on the very point it earlier disclaimed, and for which it admitted it had no evidence—whether another developer could have performed FSMC's projects more cheaply.  After reminding the jury of Bills's and Balling's testimony that construction management fees were typically "in the range of two to two-and-a-half percent … maybe up to 5 percent," A1472, the prosecution told the jury:

> I can't tell you that those companies would have charged less
> than the 3.5 percent that LP Ciminelli charged for Riverbend.
> That's 3.5 percent of 750 million as you heard.  And I can't tell

> you they would have charged less than the 6 percent that COR
> charged on the 100 or so million for the film hub and Soraa.
>
> The reason I can't say what those companies would have
> charged for these jobs is because this fraud worked.

A1473.  The prosecution thus coyly did precisely what it said it would not—it

suggested that 2.5 percent is less than 3.5 percent; that 5 percent is less than 6

percent; and that such differences on projects of this size came to vast sums ("3.5

percent of 750 million as you heard.... 6 percent ... on the 100 or so million for the

film hub and Soraa.").  Then it told the jury this somehow showed that "this fraud

worked."

There was no other reason to admit or argue this evidence.  What other

developers might "typically" charge in the abstract had no bearing on what the fees

may have been in this case.  *See* A1291 (district court stating, "I have no idea how

Mr. Balling has any idea what the development fee ought to have been in this

case.").  The fact that developers charge "a range of development fee[s]" in the

abstract—the purported reason for admission (A1260)—is not probative of any

disputed issue in the case.  Notwithstanding the purported limitation, the only use

to which Bills's and Balling's testimony was put was its use in summation: to tell

the jury Defendants' fees were higher than "typical," to the tune of tens of

millions.  A1472-1473.[19]  Yet even while the government was allowed this

---

[19] Defendants' objection to this piece of the government's closing was over-
ruled.  A1475.

evidence and argument, Defendants were prohibited from putting on their own evidence that the projects were reasonably priced and of first-rate quality.

## D. At a Minimum, Kaloyeros Is Entitled to a New Trial Before a Properly Instructed Jury

At a minimum, Kaloyeros is entitled to a new trial under correct instructions on the right-to-control theory.

Jury instructions are reviewed *de novo*, and are erroneous if they "either fail[] to adequately inform the jury of the law, or mislead[] the jury as to a correct legal standard.'" *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006) (citation omitted). Because "improper instruction on an element of the offense violates the Sixth Amendment's jury trial guarantee," *Neder v. United States*, 527 U.S. 1, 12 (1999), it requires a new trial unless the error is harmless beyond a reasonable doubt. *See id.* at 15 (citation omitted).

Here, the district court's right-to-control instructions suffered severe flaws: (1) the court did not instruct that if the FSMC received (and was intended to receive) the full economic benefit of its bargain, that was not wire fraud; (2) the court did not adequately instruct that Defendants must have intended to cause tangible economic harm; and (3) the court omitted limiting language from this Court's precedents marking the bounds of right-to-control theory. These deficiencies, individually and together, were not harmless beyond a reasonable doubt.

1. **The court did not instruct that if the company received (and was intended to receive) the full economic benefit of its bargain, that is not wire fraud**

This Court has made one thing repeatedly clear: if the company received, and was intended to receive, the full economic benefit of its bargain, that is not wire fraud. *Binday*, 804 F.3d at 570 & n.10; *Novak*, 443 F.3d at 159; *Starr*, 816 F.2d at 98-99; *Shellef*, 507 F.3d at 108. Defendants proposed so instructing the jury. A911. The district court refused the instruction, *see* A980-981, having ruled the benefit of the bargain irrelevant. The core of the rejected instruction—"the full economic benefit of its bargain"—is taken nearly verbatim from *Binday*'s description of this Court's "repeated[]" holdings. *See* 804 F.3d at 570. Its omission misled the jury regarding a central pillar of this Circuit's right-to-control jurisprudence, Sec. I.A, *supra*, at 23, and denied Defendants the right to have the jury consider that central proposition for their defense, Sec. I.C.1, *supra*.

2. **The court did not adequately instruct that Defendants must have intended to cause tangible economic harm**

It is also a central requirement for any wire fraud conviction that the defendant must have intended to cause the victim tangible economic harm. *See* Sec. I.A, *supra*.[20] Defendants included that intent in their proposed right-to-control instruction:

---

[20] *See also United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) ("A person charged with mail fraud under the right to control theory must intend to injure the person or entity misled[.]"); *United States v. Gabriel*, 125 F.3d 89, 97

(Continued …)

It is not necessary for the government to prove that Fort Schuyler actually lost money or property as a result of the scheme. *Such a loss must, however, have been intended by the defendant you are considering.* It is not enough for Defendants to have recognized the possibility that the alleged scheme would result in economic loss; *they must have intended to cause such economic loss*.

A912 (citing *Binday*; *D'Amato*; and *Gabriel*). The district court refused this request, instead instructing only that "the Government must prove that *the alleged scheme* contemplated depriving Fort Schuyler of money or property." A980 (emphasis added). Because a scheme may involve multiple people, and may exist independent of an individual defendant, the court's requirement that "the alleged scheme" contemplate deprivation of money or property did not require that *each defendant* have that intent.

Defendants further proposed, in their instruction on knowing and willful participation in the scheme, that "'[i]ntent to defraud' means to act knowingly and with the specific intent to deceive *for the purpose of depriving another of money or property*, as I have instructed you" in the previous instruction. A913 (emphasis added). Again, the court refused. It instead instructed that the government must prove each defendant "participated in the scheme to defraud knowingly, willfully, and with a specific intent to defraud," A981, but it defined "intent to defraud" to mean "to act knowingly and with a specific intent to deceive, *for the purpose of*

(2d Cir. 1997).

- 40 -

*causing Fort Schuyler to enter into a transaction without potentially valuable economic information,* as I previously defined that term." A982 (emphasis added). The phrase "transact without potentially valuable economic information" is not a substitute for causing tangible economic loss. *See* Subsec. 4, *infra*.

This omission misled the jury as to the key intent requirement of the right-to-control theory, expressed in repeated decisions of this Court. In *Binday*, the instruction this Court approved referred not to deprivation of information, but to *intended loss of money or property*: "it is not necessary for the government to prove that any insurance company actually lost money or property," but "[s]uch a loss must … have been contemplated *by the defendant*." 804 F.3d at 581 (emphasis added). Similarly, in *Finazzo*, the court defined the required *intent* to defraud to mean "to act knowingly and with the specific intent to deceive, *for the purpose of causing some financial or property loss to another*." *Finazzo*, 850 F.3d at 108 (emphasis added). The district court refused such an instruction here (A912).

*Binday*'s statement that "it suffices that a defendant intend that his misrepresentations induce a counterparty to enter a transaction without the relevant facts *necessary* to make an informed economic decision," 804 F.3d at 579 (emphasis added), does not support the court's instruction. That statement—made in analyzing the sufficiency of the evidence, not the correct jury instruction—addressed *Binday*'s facts, where the defendants were found to have misrepresented

details of insurance policies that directly affected the pricing and profitability of the policies. *See id.* (citing *Rossomando*, 144 F.3d at 201 n.5); *see also id.* at 565-67. Thus, it concerned information necessary to value the transaction, not information that the counterparty merely would have wanted to know. *See* Sec. I.A, *supra*, at 20-21. *Binday* does not do away with this Court's long and repeated holding that the defendant "*must intend to injure the person or entity misled*," *D'Amato*, 39 F.3d at 1257 (emphasis added), that is, to "inflict" "harm" to their money or property interest, *Starr*, 816 F.2d at 99. The district court's omission of this requirement from the jury charge misled the jury as to an essential requirement of the right-to-control theory.

### 3. The court's instruction removed limiting language cabining the right-to-control theory

More broadly, the district court's right-to-control instruction omitted important limiting language from this Court's decisions setting the boundaries of the right-to-control theory. Where a defendant requested a different jury instruction from that given, the defendant must show the requested instruction accurately represented the law, and that viewing the whole charge given, he was prejudiced. *See United States v. Bah*, 574 F.3d 106, 113 (2d Cir. 2009). Both are true here.

This Court's right-to-control decisions are replete with rulings limiting the right-to-control doctrine by stating what will not suffice for conviction. *See* Sec.

I.A, *supra*.  The district court's right-to-control instruction eliminated most of them, leaving a slanted instruction that amply explained what *could* form the basis of conviction, while minimizing any explanation of what would *not*.

*First,* the district court refused to instruct the jury that "not every misrepresentation that could affect someone's decision of how to use his or her assets is sufficient to support a wire fraud conviction," A911, a proposed instruction taken nearly verbatim from *Finazzo*, 850 F.3d at 111.

*Second,* the district court refused to instruct that "[t]he loss of the right to control money or property constitutes deprivation of money or property only when the scheme, if it were to succeed, would result in economic harm to the victim," A911, another verbatim quotation from *Finazzo*.  850 F.3d at 110 (quoting *Binday*, 804 F.3d at 581).

*Third*, the district court refused to instruct that

> The mere possibility that Fort Schuyler *might* have paid less is not enough; the Government must prove beyond a reasonable doubt that the alleged misrepresentation prevented Fort Schuyler from negotiating a better bargain, or that it did not get the product it bargained for.

A912 (citing *Starr*, 816 F.2d at 96 and *Jabar*, 2017 WL 4276652, at *9); *see also* *Mittelstaedt*, 31 F.3d at 1217 (admonishing that "[t]he jury should have been so instructed") (quoted in *Finazzo*, 850 F.3d at 111).  This instruction was critical, given the government's reliance on precisely this speculative theory that an

unspecified "better value" *might* have been available (*see* Sec. I.B.2, *supra*). Without this instruction, the government was free to argue that its inability to prove a better deal was available did not matter—somehow the *absence* of such evidence showed the "fraud worked." A1473; *see supra* at 29. That of course is not the law. *See Pauling*, 2019 WL 2220129, at *4-5, *7-8 (speculation cannot substitute for proof beyond a reasonable doubt).

Rather than explain those limitations plainly up front, the court, after erroneously instructing on "potentially valuable economic information," A980-981, *see* Subsec. 4, *infra*, added:

> If all the Government proves is that the Defendant caused Fort Schuyler to enter into an agreement it otherwise would not have, or caused Fort Schuyler to transact with a counterparty it otherwise would not have, without proving that Fort Schuyler was thereby exposed to tangible economic harm, then the Government will not have met its burden of proof. In this regard, economic harm is not limited to monetary loss. Instead, tangible economic harm has been proven if the Government has proven that the scheme, if successful, would have created an economic discrepancy between what Fort Schuyler reasonably anticipated it would receive and what it actually received.

A981. Despite amalgamating concepts from this Circuit's law proposed by the defense, *see* A911, this instruction is misleading because it omits the key word: "only." It does not instruct, as this Circuit's law provides, that tangible economic harm has been proven *only* if the government has proved a difference between what FSMC expected and what it received. *See Binday*, 804 F.3d at 581. Instead,

- 44 -

it told the jury what would be *sufficient*, without instructing that it is also *required*. The district court consistently eliminated this Court's limitations on the right-to-control theory, inviting conviction without clearly delineating the theory's bounds.

The district court's comments at the charge conference showed that approach. When defense counsel protested that the court's draft instruction would confuse jurors, and asked for this Court's limiting language, A1438, the Court responded by reviewing the government's evidence and expressing concern that the instruction communicate to the jury how that evidence might suffice to convict under the government's theory. *See* A1438-1439. But the court expressed no similar concern about being sure to communicate to the jury how that evidence might *not* suffice to meet this Court's limitations on the right-to-control theory. The instruction it gave eliminated many of the theory's limitations, or cut them to the bone. *See* A960-61. The resulting instruction was unfairly slanted, and misled the jury regarding the core requirements of right to control.

> **4.  The court's instruction on "potentially valuable economic information" does not cure the deficiencies in its instruction**

Instead of focusing on the core requirements of this Circuit's right-to-control landmarks, the trial court focused its instruction on "potentially valuable economic information":

> The victim's right to control the use of its assets is injured when it is deprived of potentially valuable economic information that it would consider valuable in deciding how to use its assets. In this

context, "potentially valuable economic information" is information that affects the victim's assessment of the benefits or burdens of a transaction, or relates to the quality of goods or services received or the economic risks of the transaction.

A980-981.

Though the court drew its focus on "potentially valuable economic information" from *Finazzo,* it modified the instruction quoted there (850 F.3d at 108, 111) so that it is insufficient even under *Finazzo*'s reasoning. *First*, unlike in *Finazzo*, the district court's instruction made liability turn on FSMC's *subjective assessment* of the information, rather than whether it was *objectively* capable of resulting in tangible economic harm. *See* A981 (stating the victim's right to control "is injured when it is deprived of potentially valuable economic information that *it would consider valuable* in deciding how to use its assets," and defining "potentially valuable economic information" to be "information that affects *the victim's assessment of* the benefits or burdens of a transaction") (emphasis added). *Finazzo* cast severe doubt on the viability of a jury instruction resting on a victim's *subjective* assessment, because such an instruction would be at odds with the requirement of actual (objective) tangible economic harm. *See Finazzo*, 850 F.3d at 112 & n.19 (discussing *Dinome* and *Mittelstaedt*).

*Second*, *Finazzo*'s heavy reliance on the phrase "potentially valuable economic information," without more, is too attenuated from the core requirement

that "*those misrepresentations or non-disclosures can or do result in tangible economic harm.*" *Finazzo*, 850 F.3d at 111 (emphasis added). *Finazzo*'s conclusion that the instruction there was "adequate to convey the tangible-harm requirement," *id.* at 113 n.20, rested on the dictionary definition of a single word, "valuable," *id.* at 111, and the reasoning that if information is "potentially valuable," it "*necessarily* creates a risk of tangible economic harm." *Id.* Tenuous even in *Finazzo*, that reasoning is stretched to the breaking point when extended to the very different facts here. In *Finazzo*, tangible economic harm was proven by ample evidence: one of Aeropostale's vendors was selling it hundreds of millions of dollars in "subpar"-quality merchandise at above-market prices, in exchange for kickbacks to an Aeropostale executive of half that vendor's profits. 850 F.3d at 96-103. The *absence* of evidence here stands in stark contrast: the government never claimed that FSMC suffered *any* economic harm on price or quality of the development projects. Instead, it argued only that lack of competition *might* have kept FSMC from obtaining a better deal, but admitted it had *no* evidence a better deal was available. *See* Sec. I.B.2, *supra*. On this attenuated theory, it is too much to expect that the common meaning of "valuable" meant jurors instructed on "potentially valuable economic information" must *necessarily* have found tangible economic harm—especially since this jury was not left to the common meaning of

"valuable," but instead was given a definition by the court that incorporated FSMC's *subjective* "assessment of the benefits or burdens" of the transaction.[21]

Acknowledging the instruction was merely "adequate" on the facts of that case, the *Finazzo* opinion expressly recommended a "more direct[]" instruction: "The loss of the right to control money or property *only* constitutes deprivation of money or property if the scheme could cause or did cause tangible economic harm to the victim." 850 F.3d at 113 n.20 (emphasis added). Defendants proposed, and the district court refused, a nearly identical instruction. *See* A911; Subsec. 3, *supra*. The district court's elimination of "only" from its substitute instruction did not convey to the jury that tangible economic harm is a necessary core requirement in order to convict. *See supra* at 44-45.

### 5.    The instruction errors were not harmless beyond a reasonable doubt

To avoid retrial, the government must show it is "beyond a reasonable doubt that the jury's verdict ... was not affected by the erroneous instruction." *Pope v. Illinois*, 481 U.S. 497, 502 (1987); *accord Neder*, 527 U.S. at 18. In harmless error analysis, inferences are *not* drawn in favor of the government. *See United States v. Mejia*, 545 F.3d 179, 199 n.5 (2d Cir. 2008). Here, the court's instruction errors

---

[21] To the extent *Finazzo* arguably establishes the sufficiency of an instruction on "potentially valuable economic information" as a matter of law, *Finazzo* is erroneous and should be overruled.

were prejudicial, both individually and cumulatively. The government cannot show them harmless, much less harmless beyond a reasonable doubt.

(1) Had the jury been told there was no fraud if FSMC received, and was intended to receive, the full benefit of its bargain, *see* Subsec. 1, *supra*, no rational jury could have convicted. The government did not dispute that FSMC *did* receive the full benefit of its bargain on each contract, and it presented no proof that Defendants intended otherwise. As it was, the government did not have to confront this fatal deficiency, *see* A1470-1473 (summation), and the jury did not have to consider it, *see* A980-981.

(2) Had the jury been instructed that the government had to prove beyond a reasonable doubt that each Defendant *intended* to cause FMSC tangible economic harm, Subsec. 2, *supra*, it would have had to consider whether each Defendant had such intent. Under the instruction as given (A981-982), the jury was never asked to do so, *see also* A1470-1473 (summation), and the evidence does not establish beyond a reasonable doubt that any rational jury would have found it.

(3) Had the jury been fully instructed on this Court's well-recognized limitations on the right to control theory (Subsec. 3, *supra*), it could not and would not have convicted. The government cannot prove, beyond a reasonable doubt, that the jury's verdict was wholly unaffected by the omission of those limitations from the jury charge.

(4)  Finally, the district court's instruction on "potentially valuable economic information," and its refusal to instruct that anything beyond that concept was required to convict, Subsec. 4, *supra*, undoubtedly contributed to the verdict.  The district court's substitution of that phrase in place of this Court's other limitations eliminated or distorted the government's burden to prove tangible economic harm and intent to cause it, *see* Sec. I.A, *supra*; *Finazzo*, 850 F.3d at 113 n.20.  Worse, it allowed the government, in summation, to conflate "potentially valuable economic information" with information FSMC *would have wanted to know*.  *See* A1472-1473.  This allowed the government to obtain conviction for deprivation of information that merely affected FSMC's choice of whom to contract with, without showing that information was capable of causing, or intended to cause, economic damage to FSMC.  Under this Court's repeated holdings, that is not wire fraud.  *See* Sec. I.A, *supra*, at 20-21.

The government cannot show beyond a reasonable doubt that the jury instruction errors did not contribute to the verdict.  Kaloyeros is entitled to a new trial before a correctly instructed jury.

## II.    The "Right to Control" Theory Is Fatally Flawed

Even if the district court's right-to-control rulings and instructions comported with this Court's precedents (which they did not), the right-to-control theory itself is fatally flawed under Supreme Court precedent.  Kaloyeros challenged the

right-to-control theory on the following grounds below.[22]  To the extent these arguments were foreclosed by Circuit precedent, particularly *Finazzo*, that precedent should be overruled.  To the extent any of these issues are close or ambiguous calls, considerations of lenity, strict construction, and fair notice militate against extending the statute's property-goal requirement to reach the intangible right to control.  *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 410-11 (2009) (lenity); *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (strict construction); *United States v. Lanier*, 520 U.S. 259, 266 (1997) (fair notice; rule against retroactive application of novel judicial construction).  Notably, *Finazzo* was decided in 2017, after the charged conduct here.  We are unaware of any case, especially one decided before the charged conduct, that has extended the right-to-control theory to charged bid-rigging.  Kaloyeros respectfully preserves these arguments for further review.

## A.     The Right to Control One's Assets Is Not Money or Property

The mail and wire fraud statutes are "limited ... to the protection of property rights."  *McNally*, 483 U.S. at 360; *accord Cleveland v. United States*, 531 U.S. 12, 19 (2000).  The right to control one's use of assets has never been recognized by the Supreme Court as "money or property" protected by the mail and wire fraud

---

[22] *See* A255-261; *see also* SA12 (n.7) (collecting submissions challenging the theory).

statutes, and other circuits have rejected the contention. *See United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014); *United States v. Bruchhausen*, 977 F.2d 464, 470 (9th Cir. 1992). Nor is a fair bidding process "a traditionally recognized, enforceable property right." *United States v. Henry*, 29 F.3d 112, 115 (3d Cir. 1994). Finally, "mere contemplation of an ongoing contractual relationship"—the result of preferred developer status here—is not a property right protected by the mail and wire fraud statutes. *United States v. Slay*, 717 F. Supp. 689, 693-95 (E.D. Mo. 1989); *cf. Sekhar v. United States*, 570 U.S. 729, 740 (2013) (Alito, Kennedy, Sotomayor, JJ., concurring) (concluding a recommendation to engage in future transactions was not property).

### B. "Potentially Valuable Economic Information" Is Not Property In the Victim's Hands

The district court ruled that "[i]n a right-to-control case the property interest at issue is the information that was misrepresented or withheld," and that "[i]nformation is property under this theory if it is potentially economically valuable." A996. The district court rested this conception in part on *United States v. Wallach*, which stated the right-of-control theory is "predicated on a showing that some person or entity has been deprived of potentially valuable economic information." 935 F.2d 445, 462-63 (2d Cir. 1991); A1439. In the district court's view, deprivation of such information was the only issue, A1000, and it so instructed the jury. *See* A1554; Sec. I.D.4, *supra*.

The "ethereal right to accurate information," however, "fall[s] outside th[e] [wire fraud] statute." *Sadler*, 750 F.3d at 591. In *Wallach*, this Court pointed to the Supreme Court's recognition that "the *Wall Street Journal*'s confidential business information—an intangible interest—constituted property within the statute's purview." 935 F.2d at 461 (citing *Carpenter v. United States*, 484 U.S. 19, 25 (1987)). But it is one thing to say a party's own confidential information— such as its intellectual property, a trade secret, or, in *Carpenter*, its pre-publication opinion about market trades—is a protectable property interest. It is something different to say the *accuracy* of information withheld or disclosed by another is protected property.

Moreover, the wire fraud statute "requires the object of the fraud to be 'property' in the victim's hands." *Cleveland*, 531 U.S. at 26 (holding that even if a license could be property in the defendant's hands, it was not property while still in the control of the granting authority). So too with "potentially valuable economic information"—even if it were property, it is not property "in the victim's [here, FSMC's] hands." A defendant cannot *obtain from* the putative victim information that the defendant possesses but the victim does not. Put another way, he cannot simultaneously *obtain* and *withhold* the same information from the victim. Outside the area of protectable secrets, *see Carpenter*, 484 U.S. at 25, simple information, or its accuracy, cannot be property protected by the wire fraud statute.

## C.     To Support a Wire Fraud Conviction, the Money or Property Must be Obtainable

The wire fraud statute punishes those who participate in a scheme for "obtaining money or property" through deceit.  18 U.S.C. § 1343.  Similarly, the Hobbs Act punishes those who commit extortion, defined as "obtaining [] property from another" through threat of force.  18 U.S.C. § 1951(b)(2).  Both statutes thus contain functionally identical prohibitions: "obtaining property" by illegal means.[23]

In *NOW v. Scheidler*, 537 U.S. 393 (2003), the "property" alleged to have been "obtained" was abortion clinics' right to control the use of their facilities. *Id.* at 401.  The Supreme Court held that "'obtaining' ... entailed both a deprivation and acquisition of property," *id.* at 404, and that even though Operation Rescue might *deprive* clinics of that interest, it could not *obtain* that interest *from* the clinics.  *Id.* at 404-05.  Thus, that right to control was not a property interest protected by the Hobbs Act.

In *Sekhar*, the property right charged to have been obtained was a general counsel's right to recommend a particular investment "free from threats."  570 U.S. at 732.  The Court repeated its *Scheidler* holding that obtaining property requires not only deprivation but also acquisition, or in short, that the property must be "*transferable*—that is, capable of passing from one person to another."  *Id.* at 734.

---

[23] "Obtain" means "transfer," of course; one cannot "obtain" property from oneself.  Thus, "from another" is not a distinguishing statutory term; anyone who "obtains property" by definition obtains it "from another."

Thus, "a defendant must pursue something of value from the victim that can be *exercised, transferred, or sold*." *Id.* at 736 (emphasis added). The Court held the general counsel's right to recommend an investment free of intimidation—similar to FSMC's asserted right here to transact free of misinformation—was *not* transferable, and therefore not "*obtainable property* under the Hobbs Act." *Id.* at 737.

So here: even if Defendants could *deprive* FSMC of its right to control use of its assets, they could not *obtain* that right *from* FSMC. There is no reason to interpret the wire fraud statute differently from the Hobbs Act on the question of whether the right to control use of assets is obtainable property, since both statutes use the same "to obtain property" language. The right to control thus is not an obtainable property interest protected by the wire fraud statute.

For these reasons, FSMC's right to control use of its assets was not a sufficient basis for conviction.[24]

## III. The District Court's "No Ultimate Harm" Instruction Misled the Jury Regarding Good Faith and the Required Intent to Cause Harm

At the end of its good faith instruction, the district court told the jury:

> In considering whether a Defendant acted in good faith, you are instructed that if a Defendant knowingly and willfully participated in the scheme to deprive FSMC of potentially valuable economic information, a belief by that Defendant that eventually everything

---

[24] Even if it were, Defendants would be entitled to a new trial under correct legal standards. The district court erroneously declined Defendants' alternative proposed jury instruction. *See* A927-929; A1438.

would work out so that FSMC would get a good deal does not
mean that the Defendant acted in good faith.

A983. This instruction lacked a factual predicate in this case, and was reversible error: it misled the jury regarding the required intent to cause economic harm, and undercut the defense of good faith, inviting conviction even where Defendants lacked the intent required for conviction.[25]

Again, the offenses here required that Defendants intend to cause tangible economic harm. The standard "no ultimate harm" instruction—that "a belief by the defendant … that ultimately everything would work out so that no one would lose any money does not require a finding by you that he acted in good faith," *Rossomando*, 144 F.3d at 199—is problematic because "[o]n its face," it is "at odds with the requirement that a defendant must have intended to harm his victim in order to be guilty of mail [or wire] fraud." *Id.* at 201. In truth, "an 'honest belief on the part of the defendant that the scheme would not ... result in a financial loss' to his victim *is* a defense to mail fraud." *Id.* (emphasis in original). The same is true here: "a belief by [a] Defendant that ... FSMC would get a good deal" *is* a defense—it would mean the Defendant lacked intent to harm FSMC by keeping it from getting a better deal. An instruction that such a belief is *not* good faith is "on its face" inconsistent with—indeed, 180 degrees opposite to—that defense. *Id.*

---

[25] The standard of review for jury instruction error is set out in Sec. I.D, *supra*.

The key word of the instruction is "ultimately" (or here, "eventually"). *See*

*Rossomando*, 144 F.3d at 201.  The point of the instruction, in a proper case, is that

where the defendant contemplates "some immediate loss to the victim," his belief

"that he will '*ultimately*' [or '*eventually*'] be able to work things out so that the

victim suffers no loss is no excuse for the real and immediate loss contemplated."

*Id.* (emphasis added).  Thus, where a defendant lies to obtain a loan, but plans to

pay it back, his intention to repay is not a defense, because he intends by his lie to

inflict immediate harm (by depriving the bank of its ability to accurately price the

credit risk), even if he intends to make the bank whole later.  *Id.* (citing *Dinome*, 86

F.3d at 280, 284).  In such a case, the instruction is appropriate.  *See id.*  But where

the defendant does not raise such an "eventually work out" defense—but instead

defends that he *never* intended any harm (as in *Rossomando*, 144 F.3d at 198), the

instruction is obvious error, because it risks confusing the jury "into believing that

the government was not required to prove" intended harm.  *Id.* at 201-02.

Thus, whether the instruction is appropriate depends on whether the defense

creates a factual predicate for it.  Did the Defendant admit intentionally obtaining

property through deceit, but contend he nonetheless believed the victim would

eventually be made whole?  If so, the instruction is appropriate.  *See* 144 F.3d at

201.[26]  Or did the Defendant contend he *never* intended *any* harm, because he

---

[26] *See also United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016); *United*

(Continued …)

believed the disputed representations would not result in any harm in the first place?  If so, the instruction is reversible error.  *Id.* at 202-03.

Here, there was no factual predicate for the "no ultimate harm" instruction. Kaloyeros did not defend that any fraud against FSMC was excused because FSMC would eventually be made whole (whether through repayment or through *eventually* getting a good deal).  Instead, he defended that he *never* intended any economic harm to FSMC in the first place—that "he acted in good faith at all times relevant to the Syracuse and Buffalo RFPs and did not intended to defraud FSMC." A1554; *see also* A1479 (counsel arguing Kaloyeros acted in good faith during the "entire package from the beginning to the end").  Nowhere in Kaloyeros's arguments regarding good faith did he advance the idea that any short-term harm to FSMC was excused because he believed things would eventually work out.[27] Instead, his consistent defense was that he never rigged the RFP process, but even if the jury had any doubt as to that, (1) such tailoring could not cause FSMC any economic harm at all, because it did not guarantee any contract award and FSMC could walk away at any time; and (2) he never intended to cause FSMC any economic harm at all.  A1501-1502.[28]

---

*States v. Ferguson*, 676 F.3d 260, 267-68, 280 (2d Cir. 2011).

[27] *See* A1019-1022 (opening statement arguing that Kaloyeros acted in good faith); A1477, A1480-1482, A1486-1490, A1502, A1505 (same in summation).

[28] The district court's instruction was also not accompanied by the clarifying
(Continued …)

Thus here, as in *Rossomando*, the "no ultimate harm" instruction misled the jury, by undercutting the good faith defense and suggesting the jury could convict even in the absence of intent to cause economic harm. *See* 144 F.3d at 202; Sec. I.D.2, *supra*. As this Court explained in *Rossomando*:

> In the absence of a sufficiently clear [factual predicate] for the court's 'no ultimate harm' instruction, there is a substantial risk that the jury could have been confused into believing that the government was not required to prove that [Defendants] intended to harm [the victim—here, FSMC]. Simply put, the jury could well have been persuaded by [Defendants'] defense that [they] did not intend to harm [FSMC], but still have believed that it should convict

under the court's instruction because Defendants believed FSMC would get a good deal. *Id.* at 202; *see* A983 (quoted *supra*). This risk was prejudicial, and cannot have been harmless beyond a reasonable doubt. *See Neder*, 527 U.S. at 18. Kaloyeros is entitled to a new trial free from this jury instruction error.

## CONCLUSION

For the foregoing reasons, this Court should reverse Kaloyeros's conviction and remand with instructions to grant judgment of acquittal. Alternatively, the Court should vacate and remand for a new trial.

---

language this Court approved in *United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir. 1999) (reiterating that the government still had to prove the defendant "associated himself with the alleged fraudulent scheme for the purpose of causing some loss to another."). Here, the district court refused such limiting language. *See* Sec. I.D.2, *supra*.

Dated:   May 29, 2019
New York, NY

Respectfully Submitted,


/s/ *Michael C. Miller*
STEPTOE & JOHNSON LLP

*Attorneys for Defendant-*
*Appellant Alain Kaloyeros*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)

1.      This brief complies with the type-volume limitation of Local Rule 32.1 because it contains 13,958 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.


Dated:  May 29, 2019                    Respectfully submitted,
New York, NY


                                        /s/ *Michael C. Miller*
                                        STEPTOE & JOHNSON LLP

                                        *Attorney for Defendant-Appellant*
                                        *Alain Kaloyeros*